**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MIAMI FIREFIGHTERS' RELIEF AND PENSION FUND, derivatively on behalf of Nominal Defendant Walgreen Co., <br><br> Plaintiff, <br><br> v. <br><br> JAMES A. SKINNER, GREG D. WASSON, JANICE M. BABIAK, DAVID J. BRAILER, STEVEN A. DAVIS, WILLIAM C. FOOTE, MARK P. FRISSORA, GINGER L. GRAHAM, ALAN G. McNALLY, DOMINIC MURPHY, STEFANO PESSINA, NANCY M. SCHLICHTING, and ALEJANDRO SILVA, <br><br> Defendants, <br><br> and <br><br> WALGREEN CO., <br><br> Nominal Defendant. | C.A. No. _____ <br><br><br> JURY TRIAL DEMANDED |

**<u>VERIFIED DERIVATIVE COMPLAINT</u>**

Plaintiff Miami Firefighters' Relief and Pension Fund ("Plaintiff"), by and through its undersigned counsel, alleges for its complaint against Defendants upon its personal knowledge as to itself, and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through its counsel and a review of publicly available information, including counsel's review of filings by the United States Securities and Exchange Commission ("SEC"), United States Department of Justice ("DOJ"). and United States Drug Enforcement Administration ("DEA"), as follows:

## I.      INTRODUCTION

1.      This is a shareholder derivative action brought on behalf of nominal defendant Walgreen Co. ("Walgreens" or the "Company") by one of its shareholders against certain members of Walgreen's Board of Directors (the "Board").  As detailed herein, these directors breached their duties to the Company by willfully permitting Walgreens to operate in "staggering disregard" to the Controlled Substances Act ("CSA") and other applicable laws, rules, and regulations aimed at preventing the unlawful distribution of controlled substances, particularly oxycodone, at the Company's retail pharmacies in Florida and nationwide.

2.      In 2008 and 2009, there was a significant rise in the number of pain-management clinics registered in Florida.  According to the DEA, many of these clinics were run by unscrupulous doctors who prescribed and dispensed large quantities of medications to drug abusers and organized criminals without any legitimate medical basis.[1]  In response, federal, state, and local law enforcement began cracking down on these so-called "pill mills" and the diversion of prescription drugs into the black market.  As a result of legislation and enforcement initiatives, drug users were forced away from pain clinics and toward legitimate pharmacies. Walgreens, which operates over 8,000 pharmacies in the United States, and over 850 in Florida, through which it distributes almost one third of all prescriptions in the state, stood in a position to absorb the pill mills' illegal business.

3.      Consequently, Walgreens' pharmacies in Florida experienced explosive growth in oxycodone sales.  In 2010, only three Walgreens retail pharmacies were in the top 100 purchasers of oxycodone within Florida.  In 2011, 38 Walgreens pharmacies made the top 100

---

[1] *See* Statement of Joseph T. Rannazzisi to the Caucus on International Narcotics Control at 6-7 (July 18, 2012), *available at* http://www.justice.gov/dea/pr/speeches-testimony/2012-2009/responding-to-prescription-drug-abuse.pdf; Statement of Michele M. Leonhart to the U.S. Senate Judiciary Committee, Subcommittee on Crime and Terrorism at 7 (May 24, 2011), *available at* http://www.justice.gov/dea/pr/speeches-testimony/2012-2009/110524_testimony.pdf ("Leonhart Statement").

and six were in the top ten.  In 2011, the top six Walgreens pharmacies in Florida each averaged more than 1.6 million dosage purchases of the strongest oxycodone dosage (30mg).  By comparison, the average U.S. retail pharmacy purchased only 73,000 dosage units of all formulations of oxycodone (15mg and 30mg) during that same period.

4.      In 2012, the DEA conducted a six-month investigation into Walgreens' retail pharmacies in Florida.  On September 13, 2012, the DEA concluded that Walgreens' continued distribution of controlled substances in Florida posed an "imminent danger to the public health and safety."  The agency issued an Immediate Suspension Order ("ISO") and Order to Show Cause ("OTSC") why Walgreen's Jupiter, Florida Distribution Center's (the "Jupiter Center") drug registration should not be revoked.  Backed by dozens of witnesses and hundreds of exhibits, the DEA found that Walgreens' pharmacists, and its senior management, had exhibited a "staggering disregard" to the Company's obligations under the CSA.  Between November 26, 2012 and February 19, 2013, the DEA issued additional OTSCs against Walgreens' top six oxycodone-selling pharmacies in Florida.

5.      On June 11, 2013, Walgreens announced it had reached an $80 million settlement with the DEA (the "2013 Settlement").[2]  The 2013 Settlement, the largest in DEA history, resolved allegations that Walgreens committed an "unprecedented number of record-keeping and dispensing violations" under the CSA.  The 2013 Settlement also resolved administrative actions by the DEA, and civil investigations by the DOJ in the Eastern District of New York, the Southern District of Florida, the District of Colorado and the Eastern District of Michigan, as well as civil investigations by the DEA nationwide.  As part of the 2013 Settlement, Walgreens

---

[2]  The Settlement and Memorandum of Agreement ("2013 Settlement Agreement") among the DOJ, DEA, Walgreens, and its wholly owned subsidiaries is attached hereto as Exhibit 1 and incorporated herein by reference.

admitted, among other things, that it had not upheld its obligations as a DEA registrant, which requires the Company to report suspicious orders of prescription painkillers like oxycodone.

6.      Publicly available information demonstrates that a majority of the Walgreens' Board was aware that the Company had been improperly selling prescription painkillers since at least 2010 – and likely since 2008 – and either condoned the practices or did nothing to prevent it.  On or about September 8, 2008, in connection with the Company's June 4, 2008 settlement with the Office of Inspector General of the United States Department of Health and Human Services ("OIG"), Walgreens entered into a Corporate Integrity Agreement (the "2008 CIA") with the OIG.  The 2008 CIA required Walgreens to enforce and enhance its policies and reporting procedures involving "the proper and accurate documentation of medical and prescription records" and "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization."  The 2008 CIA also required Walgreens to have procedures and mechanisms in place to alert the Board of any drug dispensing issues and lack of compliance with federal and state laws, such as the violations found by the DEA in 2012.

7.      Additionally, in July 2010, Walgreens' corporate headquarters analyzed oxycodone dispensing for its Florida stores, ranking each pharmacy by the number of such prescriptions dispensed in June of that year, and effectively told them to increase sales. Walgreens' supervisors responded by increasing their sales of oxycodone astronomically.

8.      Walgreens' management also alerted the Company's leadership of the drug dispensing issues.  In an email to Walgreens' corporate manager of "Rx Inventory Drug Stores" at Walgreens' headquarters, the manager of the Jupiter Center noted that Walgreens had supplied

one Florida pharmacy with 3,271 bottles of oxycodone in a single day period, and wondered how the store managed to "even house this many bottle[s]."

9.      In March 2011, Jeffrey Chudnow ("Chief Chudnow"), the Chief of Police of Oviedo, Florida, whose jurisdiction included two of the Walgreens pharmacies in question wrote identical letters to the then-Chairman of the Board, Alan McNally ("McNally"), and the Company's CEO, Greg Wasson ("Wasson"), alerting them to the more than 120 arrests he had made for illegal distribution of oxycodone and informing them that the parking lots of the Walgreens pharmacies in Oviedo, Florida had "become a bastion of illegal drug sales and drug use." The DEA found that McNally and Wasson – and through them the entire Board – ignored ignored these letters and instead showed "deliberate indifference on Walgreens' part as to its obligations as a DEA registrant."

10.     Finally, in August 2011, several DEA officials met with Walgreens personnel to discuss Walgreens' sales of oxycodone in Florida. At least ten Walgreens employees were present, including Dwayne Pinon ("Pinon"), Walgreens' corporate in-house counsel. At that meeting, the DEA told those employees that Walgreens' pharmacies, and particularly the ones in Florida, sold more oxycodone than most other pharmacies in the United States. Nonetheless, the Board failed to take any steps to address these issues.

11.     As directors of Walgreens, each of the Individual Defendants (as defined herein) owed and owes the Company and its shareholders the fiduciary duties of good faith, loyalty, fair dealing, due care, and trust in the management and administration of the Company. The Individual Defendants have breached these obligations, however, by, *inter alia*, approving, authorizing, acquiescing in and/or willfully turning a blind eye to Walgreens' substantial and systematic violation of federal and state law, including the CSA. The Individual Defendants'

conduct has threatened Walgreens' ability to operate as a pharmacy registered with the DEA. To date, these violations have cost Walgreen over $80 million and have caused the Company significant reputational harm. Absent the relief sought herein, this harm will go unaddressed.

## II.    JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000. The Court has personal jurisdiction over Defendants because Defendants committed material events giving rise to this action in this District and Defendants systematically and continuously conduct business in this state and maintain offices within this District.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because Defendants engaged in substantial conduct relevant to Plaintiff's claims within this District.

## III.    THE PARTIES

14.    Plaintiff currently holds 17,425 shares of Walgreens common stock and has been a continuous holder of Walgreens stock since at least April 30, 2005. Plaintiff is a public pension plan with a five-member board of trustees, each member of which is a citizen of Florida. Accordingly, Plaintiff is a citizen of Florida.

15.    Nominal Defendant Walgreens is an Illinois corporation with its principal place of business in Deerfield, Illinois. Founded in 1901, Walgreens is the nation's largest drug store chain, serving more than 6.3 million customers each day. It operates more than 8,000 retail pharmacies across the United States, employing roughly 27,000 pharmacists and filling nearly 800 million prescriptions each year, representing approximately 21 per cent of all prescriptions in the United States. The Company reported $72.2 billion in sales in 2011, two-thirds of which came from pharmacy sales. Walgreens has approximately $44 billion in market capitalization,

and its stock trades on the New York Stock Exchange under the ticker symbol "WAG." Walgreens' Board maintains several standing committees on which the Company's directors serve. These standing committees include the Audit Committee and the Nominating and Corporate Governance Committee.

16. Defendant James A. Skinner ("Skinner") is the Chairman of the Board. Skinner has been a director of the Company since July 1, 2005 and Chairman since July 11, 2012. Skinner has served on the Audit Committee since 2006. Since July 11, 2012, Skinner has attended meetings of all Board committees. Since 2008, Skinner has received more than $1,200,000 for his service as a director of the Company. Upon information and belief, Skinner is a citizen of Illinois.

17. Defendant Wasson is President and CEO of Walgreens. Wasson has been a director of the Company since February 1, 2009. Wasson was President and CEO of Walgreens from May 2007 to February 2009, Executive Vice President from October 2005 to May 2007, Senior Vice President from February 2004 to October 2005, and Vice President from October 2001 to February 2004. Since 2008, Wasson has received more than $38.8 million for his service to the Company. Upon information and belief, Wasson is a citizen of Illinois.

18. Defendant Janice M. Babiak ("Babiak") has been a member of the Board since April 9, 2012. Babiak has served on the Audit Committee since April 9, 2012, and currently serves as its Chairman. Upon information and belief, Babiak is a citizen of Tennessee.

19. Defendant David J. Brailer, M.D. ("Brailer") has been a member of the Board since October 1, 2010. Davis has served on the Audit Committee since December 1, 2010. Since 2008, Brailer has received more than $312,000 for his service as a director of the Company. Upon information and belief, Brailer is a citizen of California.

20.     Defendant Steven A. Davis ("Davis") has been a member of the Board since March 16, 2009.  Davis has served on the Nominating and Corporate Governance Committee since 2009 and currently serves as its Chairman.  Since 2008, Davis has received more than $679,000 for his service as a director of the Company.  Upon information and belief, Davis is a citizen of Ohio.

21.     Defendant William C. Foote ("Foote") has been a member of the Board since 1997.  Foote has served on the Nominating and Corporate Governance Committee since 1999.  Since 2008, Foote has received more than $1,196,000 for his service as a director of the Company.  Upon information and belief, Foote is a citizen of Wisconsin.

22.     Defendant Mark P. Frissora ("Frissora") has been a member of the Board since January 14, 2009.  Frissora has served on the Nominating and Corporate Governance Committee since 2009.  Since 2008, Frissora has received more than $727,000 for his service as a director of the Company.  Upon information and belief, Frissora is a citizen of New Jersey.

23.     Defendant Ginger L. Graham ("Graham") has been a member of the Board since May 1, 2010.  Since 2008, Graham has received more than $412,000 for her service as a director of the Company.  Upon information and belief, Graham is a citizen of Colorado.

24.     Defendant McNally has been a member of the Board since 1999.  McNally was the acting CEO of Walgreens from October 10, 2008 to February 1, 2009 and lead director of the Board from January 30, 2008 to October 10, 2008.  McNally served on the Nominating and Corporate Governance Committee since 2002, but stepped down from that committee upon assuming the position of acting CEO.  He rejoined that committee on July 11, 2012.  Since 2008, McNally has received more than $2,131,000 for his service as a director of the Company.  Upon information and belief, McNally is a citizen of Illinois.

25.     Defendant Dominic Murphy ("Murphy") has been a member of the Board since August 2, 2012.  Murphy was nominated to the Board pursuant to a Company Shareholders Agreement among Walgreens, an affiliate of Kohlberg Kravis Roberts & Co. L.P. ("KKR"), and others, in connection with Walgreens' acquisition of a 45% equity stake in Alliance Boots GmbH ("Alliance Boots"), a pharmacy retailer in which KKR had previously invested $1.8 billion.  Murphy is a partner of KKR and has been a member of the board of directors of Alliance Boots since 2007.  In September 2012, an affiliate of KKR served as co-managing underwriter for Walgreens' public offering of $4 billion of debt securities.  Upon information and belief, Murphy is a citizen of the United Kingdom.

26.     Defendant Stefano Pessina ("Pessina") has been a member of the Board since August 2, 2012.  Pessina was also nominated to the Board pursuant to the Company Shareholders Agreement in connection with Walgreens' acquisition of a 45% stake in Alliance Boots.  Pessina has served as Executive Chairman of Alliance Boots since 2007.  Upon information and belief, Pessina is a citizen of Monaco.

27.     Defendant Nancy M. Schlichting ("Schlichting") has been a member of the Board since October 1, 2006.  Schlichting has served on the Audit Committee since October 11, 2006.  Since 2008, Schlichting has received more than $1,127,000 for her service as a director of the Company.  Upon information and belief, Schlichting is a citizen of Michigan.

28.     Defendant Alejandro Silva ("Silva") has been a member of the Board since January 9, 2008.  Silva has served on the Audit Committee since January 9, 2008.  Silva has served on the Nominating and Corporate Governance Committee since 2008.  Since 2008, Silva has received more than $933,000 for his service as a director of the Company.  Upon information and belief, Silva is a citizen of Illinois.

29.     The Defendants identified in paragraphs 16 through 28 are collectively referred to herein as the "Individual Defendants."

## IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.     Fiduciary Duties of the Members of the Board

30.     By reason of their positions as officers, directors and/or fiduciaries of Walgreens and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Walgreens and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Walgreens in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Walgreens and its shareholders.

31.     Each director and officer of the Company owes to Walgreens and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Walgreens, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial and directorial positions with Walgreens, each of the Individual Defendants had access to adverse non-public information about the operations and improper practices of Walgreens.

33.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Walgreens, and was at all times acting within the course and scope of such agency.

34.     To discharge their duties, the officers and directors of Walgreens were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Walgreens were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority;

b.     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock;

c.     remain informed as to how Walgreens conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

d.     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

35.     The 2008 CIA also imposes additional duties on Walgreens directors and officers and required specific compliance changes and regular reporting to the Walgreens Board and its Audit Committee of certain activity.

36.     Specifically, Walgreens' Policies and Procedures are to be reviewed to ensure that the Company complied with the requirements of the 2008 CIA.  This included "the proper and accurate documentation of medical and prescription records" and "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization," which encompass the misconduct that the Company acknowledged in the 2013

11

Settlement Agreement. To the extent the Policies and Procedures did not have these features, the 2008 CIA required them to be added and implemented within 120 days of the effective date of the 2008 CIA, which means they would have been in place by January 2009—and to and through the time of the misconduct alleged in the 2013 Settlement Agreement.

37. Walgreens management, including members of the Board, were to receive notice of these updated policy changes as well as regular updates on compliance with the 2008 CIA, during the entirety of the five-year term of the 2008 CIA.

### B. Additional Fiduciary Duties of the Audit Committee Members

38. In addition to the fiduciary duties discussed above, the Board's Audit Committee is responsible for assisting in the oversight of, among other things, ***compliance by the Company with legal and regulatory requirements***. Since 2008, Defendants Babiak, Brailer, Schlichting, Silva, and Skinner served on the Audit Committee at various times.[3] The Audit Committee is currently composed of Defendants Babiak (Chairman), Brailer, Schlichting, and Silva.

39. The Audit Committee Charter expressly provides that the Audit Committee members "review policies and processes with respect to enterprise risk assessment and risk management and, as delegated by the full Board, review the status of key enterprise risks on a quarterly basis, and obtain periodic updates from management regarding compliance matters."

40. As alleged further below, the 2008 CIA also imposed additional duties on the Audit Committee and the Board, including oversight of compliance with the terms of the 2008 CIA. Additionally, the Company's Compliance Officer (who was responsible for developing and implementing policies, procedures, and practices pursuant to the 2008 CIA) reported to the Audit Committee on at least a quarterly basis.

---

[3] Defendant Skinner served on the Audit Committee prior to his appointment as Chairman of the Board on July 11, 2012.

41.     Specifically, the Audit Committee is expressly responsible for review and oversight of the obligations of the 2008 CIA and is also required to meet and review and oversee the Company's Compliance Program at least quarterly.  The review required pursuant to the 2008 CIA further provides a reasonable basis to infer that the Board should have been aware of the misconduct described in the 2013 Settlement Agreement.

42.     According to Walgreens' public filings, the Audit Committee met eight times in 2012, eight times in 2011, eight times in 2010, eight times in 2009, and eight times in 2008 —a total of 40 times since 2008.

**C.     Additional Fiduciary Duties of the Nominating and Corporate Governance Committee Members**

43.     In addition to the fiduciary duties discussed above, the Board's Nominating and Corporate Governance Committee, according to its charter, is responsible for "establishing the corporate governance principals of the Company," including overseeing the "evaluation . . . of the effectiveness of the Board and its committees and management."  In addition, the members of the Nominating and Corporate Governance Committee are required to "review the Company's Code of Business Conduct and recommend any changes to the Board."  The Nominating and Corporate Governance Committee is also responsible for reviewing, "[a]t least annually . . . the Company's policies and activities regarding social responsibility . . . ."

44.     According to Walgreens' public filings, the Nominating and Corporate Governance Committee met four times in 2012, three times in 2011, three times in 2010, three times in 2009, and three times in 2008 —a total of 16 times since 2008.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Walgreens' Duties and Liability Under the Controlled Substances Act

45.     The CSA creates restrictions on the distribution of controlled substances – substances that pose a risk of addiction and abuse.  The CSA authorizes the DEA to establish a registration program for manufacturers, distributors, and dispensers of controlled substances designed to prevent the diversion of legally produced controlled substances into the illicit market.  Any entity that seeks to become involved in the production or chain of distributing controlled substances must first register with DEA.

46.     Under the DEA's regulations, registered pharmacies must "provide effective controls and procedures to guard against theft and diversion of controlled substances."  21 C.F.R. § 1301.71(a).  And while "[t]he responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner," a "corresponding responsibility rests with the pharmacist who fills the prescription."  21 C.F.R. § 1301.04(a).  Pharmacies are therefore required to ensure that prescriptions for controlled substances are "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice."  *Id.*

47.     DEA registrants authorized to distribute or dispense any controlled substance are prohibited from distributing, dispensing, or manufacturing controlled substances that are not authorized by a registrant's registration.   21 U.S.C. § 842(a)(2).  Registrants must maintain accurate records and furnish them when required to do so by law enforcement officials. 21 U.S.C. § 842(a)(5).  Registrants must also maintain a degree of transparency by allowing law enforcement officials access to their premises for inspections authorized by the CSA.  21 U.S.C. § 842(a)(6).  Failure to adhere to the registration requirements of the CSA may subject a registrant to civil fines, imprisonment, or both.  21 U.S.C. § 842(c).

14

48.     The CSA also proscribes certain acts related to the manufacture and distribution of controlled substances and listed chemicals.  Registrants who knowingly or intentionally (1) distribute Schedule I and II substances without a valid order form, 21 U.S.C. § 843(a)(1); (2) use an invalid registration number during the course of handling or acquiring controlled substances, 21 U.S.C. § 843(a)(2); (3) furnish false or fraudulent material information in a record or report required by the CSA, 21 U.S.C. § 843(a)(4)(A); or (4) present false or fraudulent identification when receiving a listed chemical, 21 U.S.C. § 843(a)(4)(B); are subject to criminal fines, imprisonment, or both.  *See* 21 U.S.C. § 843(d) (requiring prison sentences of between four and eight years for DEA registrants that violate § 843).[4]  Additionally, registrants who violate the aforementioned provisions may be subject to injunctive or declarative actions filed by the Attorney General in federal district court.  *See* 21 U.S.C. § 843(f).

49.     Finally, the CSA specifies several offenses regarding listed chemicals, including Schedule II chemicals such as oxycodone.  For example, criminal fines and/or imprisonment may be imposed upon any person who knowingly or intentionally (1) possesses a listed chemical with the intent to manufacture a controlled substance without proper registration; (2) possesses or distributes a listed chemical with knowledge or a reasonable belief that the listed chemical will be used to manufacture a controlled substance; or (3) evades the CSA's recordkeeping and reporting requirements by receiving or distributing listed chemicals in small units.  *See* 21 U.S.C. §§ 841(c)(1)-(3).  Also, any person who knowingly possesses or distributes listed chemicals in violation of the CSA, or knowingly violates the CSA's recordkeeping requirements, is subject to

---

[4] Under 21 U.S.C. § 843(d), "*any person who violates this section shall be sentenced to a term of imprisonment of not more than 4 years*, a fine under Title 18, or both; except that if any person commits such a violation after one or more prior convictions of him for violation of this section, or for a felony under any other provision of this subchapter or subchapter II of this chapter or other law of the United States relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not more than 8 years, a fine under Title 18, or both."

criminal fines, imprisonment, or both.  *See* 21 U.S.C. §§ 841(f)(1)-(2).  Furthermore, in addition to the other applicable penalties, violators of the aforementioned provisions may also be enjoined for up to ten years from handling listed chemicals.  21 U.S.C. § 841(e).

      **B.**     **Walgreens' Duties Under Florida Law**

     50.     Florida law also requires wholesale distributors of controlled substances to conduct due diligence and develop a program to identify suspicious orders and prevent suspicious transactions.  *See* Fla. Stat. 499.0121(15).  In particular, a wholesale distributor must assess the reasonableness of orders in excess of 5,000 unit doses of any one controlled substance in any one month.  *See* Fla. Stat. 499.0121(15)(b).  A pharmacy that violates Florida's controlled substances distribution laws may have its permit or certification revoked.  *See* Fla. Stat. 499.067.  Pharmacies who so violate Florida law are also subject to cease and desist orders from the Florida Department of Health, Fla. Stat. 499.0661, as well as a $5,000 fine per violation per day, Fla. Stat. 499.066(2)-(3).

      **C.**     **The Rise in Prescription Drug Abuse in the United States and the State of Florida**

     51.     Prescription drug abuse occurs in the United States at an alarming rate.  The 2010 National Survey on Drug Use and Health reveals that approximately 7 million Americans abuse controlled substance pharmaceuticals for non-medical purposes.  Second only to marijuana, controlled substance prescription drugs are abused by more people than cocaine, heroin, hallucinogens and inhalants combined.  Of all prescription drugs, narcotic pain relievers such as oxycodone, hydrocodone, and oxymorphone are abused most frequently.  Each year, roughly 5.1 million people abuse narcotic pain relievers in the United States.  According to the Substance Abuse and Mental Health Services Administration's Treatment Episode Data Set, between 1998

and 2008 the number of persons admitted for treatment who reported any pain reliever abuse increased more than fourfold.

52.     Since at least 2008, the State of Florida has been the epicenter of a notorious, well-documented epidemic of prescription drug abuse.  The extent of the problem in Florida by 2010 is illustrated by a comparison of Florida with other states.  DEA records indicate that medical practitioners in Florida purchased 41.2 million oxycodone pills during the first six months of 2010, compared to a total of 4.8 million purchased by practitioners in the other 49 states combined.  In July 2011, the Florida Surgeon General declared a Public Health Emergency based on the prescription pill epidemic which had resulted in an average of *seven overdose deaths per day* in Florida.  The drugs most commonly associated with this epidemic were typically prescribed at unscrupulous pain clinics by physicians acting outside the usual course of professional practice and include Schedule II pain relievers, such as oxycodone; Schedule IV benzodiazepines, such as alprazolam (i.e., Xanax); and Schedule IV muscle relaxers, such as carisoprodol (i.e., Soma).  Frequently, these drugs are prescribed in large amounts and in combination with each other as "cocktails" popular with drug-seeking individuals.

53.     In response to the growth of prescription drug abuse in the 2000s, the DEA sent letters to all distributors and manufacturers, on September 27, 2006, February 7, 2007, and December 27, 2007.  These letters explained to distributor registrants their obligations to maintain effective controls against diversion and report suspicious orders as part of their duties within the closed system established by the CSA.  The suspicious order requirement of 21 C.F.R. § 1301.74(b) and its relationship to the statutory obligation of all distributors is to maintain effective controls against diversion of controlled substances pursuant to 21 U.S.C. §§ 823(b)(l) & 823(d)(l).  Consistent with the guidance of these letters, a distributor has an obligation to devise

and implement an effective system to identify suspicious orders and the obligation to report suspicious orders to DEA as they are discovered. A distributor has an obligation under the statutory and regulatory scheme to determine the legitimacy of any order it identifies as suspicious prior to fulfilling that order.

**D.      The Growth of Oxycodone Abuse and Florida's Legislative Response**

54.      Oxycodone is an opiate narcotic and Schedule II drug under the CSA. According to the Florida Department of Law Enforcement 2010 Report on Drugs Identified in Deceased Persons by Florida Medical Examiners, oxycodone is one of the "four most frequently occurring drugs found in decedents" statewide. The Florida Medical Examiner's Office reported a 345.9% increase in the number of overdose deaths associated with oxycodone between 2005 and 2010.

55.      According to the DEA, oxycodone is probably the most abused or diverted prescription drug on the market. In recognition of the growing threat caused by oxycodone abuse, beginning in 2007 the DEA began dedicating vastly more full time personnel to its program to prevent the diversion of prescription oxycodone to illicit use:



56.     On October 1, 2010, Florida enacted new laws to combat the prescription drug abuse problem, particularly oxycodone and other abused drugs dispensed directly from rogue pain clinics, commonly known as "pill mills."  These new laws severely restricted the ability of pain clinics and physicians to dispense Schedule II drugs directly from the clinics.  The purpose of these legislative changes was to stem the overwhelming tide of controlled substances being diverted from pill mills and into illicit channels for sale and recreational abuse.

57.     As a result of this legislation, the wholesale distribution of oxycodone to doctors and clinics plummeted from over 8,000,000 dosage units in May 2010 to roughly 200,000 units by October 2010.

---

[5] Leonhart Statement at 8.



58.     As a result, Florida pharmacies and the distributors who served them knew or should have known that starting in late 2010, there would be a significant increase in requests to dispense pursuant to prescriptions issued by physicians associated with pain clinics that were now banned from filling prescriptions themselves.

59.     Following changes in Florida law aimed at curbing the problematic dispensing of oxycodone and other "cocktail" drugs direct from the pain clinics, drug abusers have found other ways to obtain such drugs.  Rather than dispensing the drugs directly to "patients," pain clinics and complicit doctors were forced to write prescriptions for oxycodone and other abused drugs. Drug abusers wanting their prescriptions filled were forced to take their prescriptions to a retail pharmacy.  As a result, Walgreens saw an immediate and significant increase in the volume of prescriptions for oxycodone brought in by its newfound customers, many of whom resided hundreds of miles from Florida and/or their unscrupulous doctors.  The following chart, created by counsel for Walgreens, illustrates the increase in oxycodone prescriptions during 2010 and 2011 at eight Walgreens stores.

--------

[6] *Id.* at 10.



7

### E.     Walgreens' Responds to Restrictions on Pill Mills by Stepping Into Their Shoes

60.     As detailed herein, at roughly the same time that these legislative changes went into effect, Walgreens' leadership was urging the Company's Florida pharmacies to increase their oxycodone sales.

61.     In 2011, Walgreens operated 7,862 retail pharmacies in the United States. Sixteen of the top twenty-five largest Walgreens retail oxycodone purchasers, including the top six purchasers, were in Florida.  The following table shows these six stores and their yearly oxycodone purchases for 2009 through 2011:

|   | Store # Location | Oxycodone Purchases By Dosage Unit | | |
|---|---|---|---|---|
|   |   | 2009 | 2010 | 2011 |
| 1 | 03629  Hudson, FL | 388,100 | 913,900 | 2,211,700 |
| 2 | 03099  Ft. Myers, FL | 95,800 | 496,100 | 2,165,900 |
| 3 | 06997  Oviedo, FL | 80,900 | 223,500 | 1,684,900 |
| 4 | 03836  Port Richey, FL | 344,000 | 849,000 | 1,406,000 |
| 5 | 04391  Ft. Pierce, FL | 250,000 | 881,400 | 1,329,600 |
| 6 | 04727  Ft. Pierce, FL | 153,500 | 507,100 | 1,192,000 |

2013 Settlement Agreement, Ex. 1, at Appendix B.

---

[7] "Trends at Eight Walgreens' Pharmacies Dispensing High Volumes of Oxycodone, 2010-2012."  *See* Brief of Petitioner, On Petition for Review of a Final Order of the Drug Enforcement Administration, *Walgreen Co. v. Drug Enforcement Administration*, at 19, No. 12-1397 (D.D.C. Cir. Dec. 26, 2012).

62.     The following chart provides a graphic illustration of the dramatic increase in sales of oxycodone at these top six Walgreens pharmacies:



63.     As these figures suggest, by 2009 the Jupiter Center had become the single largest distributor of oxycodone products in Florida.  At about the same time as the abuse of prescription drugs became an epidemic in Florida, Walgreens' Florida retail pharmacies commanded an increasingly large percentage of the state's growing oxycodone business.  In 2010, only three Walgreens retail pharmacies were in the top 100 purchasers of oxycodone within Florida.  In 2011, 38 Walgreens pharmacies made the top 100 and six were in the top ten.  In May 2012, 44 Walgreens pharmacies were in the top 100 oxycodone purchasers.

64.     In response to the growing abuse of oxycodone, on July 1, 2011, the State Health Officer and Surgeon General, Dr. Frank Farmer, issued a statewide public health emergency declaration in response to the ongoing problem of prescription drug abuse and diversion in Florida, titled "State Surgeon General Declares Public Health Emergency Regarding Prescription Drug Abuse Epidemic."  The declaration noted that in 2010, 98 of the top 100 doctors dispensing

---

[8] Amy Pavuk, *DEA: Walgreens Was Pushing Oxycodone Sales Amid Rx-Drug Epidemic*, Orlando Sentinel (June 29, 2013).

oxycodone nationally were in Florida and that more oxycodone is dispensed in the State of Florida than in the remaining states combined.[9]  Much of this was through Walgreens.

### F.     Walgreens Knowingly Violated the Controlled Substances Act

65.     Given the pervasive and well-documented nature of oxycodone abuse, particularly in Florida, there can be no doubt that the Individual Defendants were on notice as to the importance of Walgreens' internal controls and compliance practices with respect to the distribution of controlled substances.   Indeed, Walgreens' pharmacy operations necessitate compliance with a strict regulatory scheme.   This includes a legal obligation to be proactive in preventing the diversion of certain drugs into the illegal market.   Indeed, Walgreens had just experienced disastrous consequences stemming from its previous failures in monitoring pseudoephedrine sales.[10]   Armed with this knowledge and prior experience, the Individual Defendants should have taken steps to ensure that such flagrant violations of the law did not occur again – particularly in a major market like Florida where prescription drug abuse was rampant.

66.     Walgreens knew or should have known about their obligations to report suspicious orders, as such obligations were spelled out in detail in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, on September 27, 2006, February 7, 2007, and December 27, 2007.

---

[9] *See* "State Surgeon General Declares Public Health Emergency Regarding Prescription Drug Abuse Epidemic," Florida Dept. of Health Emergency Declaration (July 1, 2011) *available at* http://newsroom.doh.state.fl.us/2011/07/01/emergency-declaration.

[10] Specifically, on August 8, 2005, Walgreens reached a civil settlement with the DOJ in which the Company accepted responsibility for supplying methamphetamine cooks with large quantities of pseudoephedrine products in the northeast Texas area.  In one such instance in April 2002, a Walgreens store in Denton, Texas sold more than 53,000 tablets to a single individual in one day.  As part of the settlement, Walgreens paid $1.3 million and further agreed to revise its compliance policies; implement computerized sales monitoring system designed to detect and prevent sales of large quantities of pseudoephedrine products; appoint a compliance officer to monitor compliance within the Company; pay for an independent monitor selected by the U.S. Attorney to conduct compliance checks; and implement a specialized training program for employees.

The purpose and proper implementation of suspicious order reporting programs was further discussed by the industry's own trade association, the Healthcare Distribution Management Association ("HDMA"), in "Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances," published in 2008.

67. Despite these glaring red flags, Walgreens' suspicious order program failed to comply with 21 C.F.R. § 1301.74(b). As discussed herein, the DEA identified numerous witnesses who stated that the "Suspicious Control Drug Orders" reports provided to DEA by Walgreens corporate headquarters were nothing more than monthly reports of completed transactions which did not meet the regulatory requirement to report suspicious orders as discovered.

68. Moreover, Walgreens conducted little to no investigation or analysis of the orders it reported as suspicious prior to completing the sale of these orders, despite the fact that on a single day, many of these orders greatly exceeded the monthly threshold established by the Company for reporting orders of a particular controlled substance as suspicious.

69. In addition, monthly reports of completed "suspicious" transactions reported by Walgreens were misleading in that they did not report each order received and shipped by the Company, but instead aggregated the orders shipped on any given day.

70. Starting on April 1, 2012, but backdated to January 1, 2012, Walgreens implemented a new system that supposedly prevented the shipment of suspicious orders. Walgreens claimed that its new system made filing suspicious order reports unnecessary. But this new "control" did not alleviate Walgreens' obligation to file suspicious order reports because the DEA requires pharmacies to file suspicious order reports when controlled substances are *ordered*, not after they are already *shipped*.

G. **Walgreens' Motive to Distribute Oxycodone**

71.     Walgreens's abdication of its responsibilities was brought about by a desire to increase oxycodone sales at its Florida retail pharmacies.  According to documents obtained by the DEA, and as reported by the *Orlando Sentinel*, Walgreens had in effect compensation programs for pharmacy employees in which bonuses were based on the number of prescriptions filled at the pharmacy.  This bonus program, combined with a concerted, corporate-directed effort to increase oxycodone sales, served as an incentive for pharmacists and pharmacy technicians to ignore the "red flags" of diversion presented by these prescriptions, many of which, in the proper exercise of the pharmacist's corresponding responsibility under 21 CFR § 1306.04(a), should have resulted in a refusal to fill.

72.     In July 2010, Walgreens' corporate headquarters conducted an analysis of oxycodone dispensing for the prior month at its Florida retail pharmacies.  Management produced an eleven-page spreadsheet, ranking all Florida stores by the number of oxycodone prescriptions dispensed in June 2010.  The spreadsheet was sent to Walgreens' market pharmacy supervisors in Florida on July 29, 2010, with the admonition that they "look at stores on the bottom end . . . .  We need to make sure we aren't turning legitimate scripts away.  Please reinforce."  A corporate market director of pharmacy operations did reinforce this message to Florida market pharmacy supervisors, highlighting that their "busiest store in Florida" was filling almost 18 oxycodone prescriptions per day, yet "We also have stores doing about 1 a day.  Are we turning away good customers?"

73.     Moreover, Walgreens executives were similarly motivated to see increased sales of prescription drugs.  According to its filings with the SEC, the Company emphasizes its pay-for-performance philosophy that places a heavy emphasis on bonuses related to achieving financial goals.  Given the compensation policies in effect at Walgreens and the fact that

approximately two-thirds of Walgreens' sales come from pharmaceuticals, senior management was therefore incentivized to encourage and/or turn a blind eye to the expanding oxycodone sales to pain clinic patients. Indeed, it is no coincidence that in FY 2011 Walgreens reported that it filled a record 819 million 30-day equivalent prescriptions, an increase of 5.3 per cent over the previous year, just as the retail market for oxycodone sales heated up.

### H. The DEA Investigates Walgreens

74. In response to the violations described herein, it was no surprise that the DEA began investigating the Company. On April 4, 2012, the DEA served Walgreens with an Administrative Inspection Warrants ("AIW") on the Jupiter Center, six individual Walgreens pharmacies, and its "corporate headquarters." The subpoena requested information concerning Walgreens' handling of controlled substances at the Jupiter Center and individual pharmacies.

75. The DEA's investigation concluded that the Company failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of 21 U.S.C. §§ 823(b)(1) and (e)(1). The DEA's investigation also revealed that Walgreens failed to detect and report suspicious orders by its pharmacy customers, in violation of 21 C.F.R. § 1301.74(b), which provides that distributors are required to "design and operate a system to disclose to the registrant suspicious orders of controlled substances . . . suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency."

76. As part of the DEA's investigation, the agency learned that in January 2011, the Company's Jupiter's CII (i.e., Schedule II controlled substance) Function Manager expressed concern about the enormous volume of 30mg oxycodone being ordered by three stores, Walgreens stores 7298, 3836, and 5018. The Function Manager concluded in an email to the "Manager, Rx Inventory Drug Stores" at Walgreens' Corporate Headquarters in Deerfield,

Illinois, that she felt the stores needed "to justify the large quantity." With regard to store 3836 in Port Richey, Florida, she noted that 3271 bottles of 100 count 30mg oxycodone (i.e., 3271 lots of 100 dosage units) had been shipped to the store in a 40-day period from December 1, 2010 to January 10, 2011, causing her to question "how they can even house this many bottle[s]." She then inquired of the same corporate manager: "How do we go about checking the validity of these orders?"

**I.      In Response to DEA Scrutiny, Walgreens Revises its Suspicious Order Policy**

77.     On April 2, 2012, Walgreens revised its suspicious order policy, but made the policy retroactively effective to January 1, 2012. The policy states, in pertinent part, that "Effective calendar year 2012, the Controlled Substance Order Monitoring and Prevention System prevents suspicious control drugs from being shipped to the stores. In calendar year 2012, because of the program mentioned, suspicious control drug reports are no longer generated as their shipment is prevented by the system."

78.     This policy, however, was fundamentally flawed because it ignored the fact that the reporting requirement of 21 CFR § 1301.74(b) applies to orders, not shipments. A suspicious order placed by a customer pharmacy is made no less suspicious by application of a system designed to reduce or eliminate such orders prior to shipping. Construing the regulation this way defeats the essential purpose of the suspicious order requirement, which is to provide investigators in the field with information regarding potential illegal activity in an expeditious manner.

**J.      Walgreens 06997, in Oviedo, Florida, Exemplifies Walgreens' Systematic Malfeasance**

79.     At the same time that Florida's new law restricting "pill mills" became effective in October 2010, Walgreens' stores were primed to capitalize. One particularly egregious

example, which illustrates the Company's scheme, occurred at Walgreens 06997 in Oviedo, Florida. This store was ranked 444th on Walgreens' ranking of oxycodone sales generated at its Florida retail pharmacies, filling on average only four oxycodone prescriptions per day in June 2010 and purchasing just 6,600 dosage units of oxycodone products that month. One year later, in June 2011, this same pharmacy purchased 169,700 dosage units of oxycodone.

80.     Oviedo is a town of about 34,000 people and is home to two Walgreens retail pharmacies. Beginning in late 2010, these pharmacies became the site of multiple arrests by the local police for drug offenses. In response, Chief Chudnow began writing letters to the pharmacies after each arrest stemming from prescriptions they filled. These letters informed the pharmacy of the circumstances of the arrest and that the dispensed drugs were not being used for treatment. They further provided the pharmacy with the name and date of birth not only of the person whose prescription they filled, but also of others associated with the illegal distribution of the dispensed drugs. These letters then concluded with a request for the pharmacy's help in "dealing with the prescription medication epidemic" by soliciting a commitment to stop further incidents.

81.     Chief Chudnow's concerns reached the highest levels of Walgreens' Loss Prevention Operations, with the Director of Divisional Loss Prevention noting in an email on January 28, 2011 that "[e]vidently the Chief of Police is concerned that we are filling too many C2 prescriptions. . . . From what I've been told, he is referencing 100 plus incidents/arrests in his jurisdiction." Walgreens' response was to "take a look at this market . . . and see if we have an increase in dispensing."

82.     Chief Chudnow convened a meeting with Walgreens' Loss Prevention officials on February 10, 2011, in an effort to provide further information regarding the problems he was

seeing at their stores and to brief them on the number of arrests at each location. On March 15, 2011, Chief Chudnow sent identical letters to both Chairman McNally and CEO Wasson, asking them for their support and assistance in combating the prescription drug epidemic, informing them that Oviedo "has seen the parking lots of your stores become a bastion of illegal drug sales and drug use" where once the prescriptions are filled, "the drugs are sold, distributed as payment, crushed and snorted, liquefied and injected, or multiple pills swallowed while in the parking lot of your pharmacies."

83.     Notwithstanding that the foregoing information regarding ongoing diversion and drug-related criminal activity reached the highest levels of the Company – and bearing in mind that the average U.S. retail pharmacy in 2011 purchased only 73,000 dosage units of all formulations of oxycodone for the entire year – the Individual Defendants permitted the Company to ship the following quantities of 30mg formulation oxycodone to Oviedo store 06997:

**Oxycodone Dosage Units (30mg formulations)**
**Shipped to Walgreens from the Jupiter Center**

| Month  | Dosage Units |
|--------|--------------|
| Feb-11 | 75,300       |
| Mar-11 | 72,900       |
| Apr-11 | 101,700      |
| May-11 | 133,900      |
| Jun-11 | 115,200      |
| Jul-11 | 145,300      |

**K.      Walgreens' Other Pharmacies Committed Similar Abuses**

84.     Walgreens' distribution practices were not limited to a few rogue pharmacies. Many of the Company's pharmacies dispense oxycodone in amounts far in excess of the U.S. and Florida averages and had also experienced dramatic increases in their distribution of oxycodone from at least 2009 to the present. No fewer than 43 Walgreens pharmacies in Florida

purchased in excess of 500,000 dosage units of oxycodone in 2011, despite a national average of approximately 74,000 dosage units for all U.S. pharmacies and an average of approximately 110,000 dosage units for all Florida Walgreens pharmacies.

85.     While the detailed information provided by Chief Chudnow put Walgreens on notice of actual diversion occurring at the two Oviedo pharmacies, the Company had ample other indications that its pharmacies were direct and significant contributors to the epidemic of prescription drug abuse and diversion in Florida.

86.     On December 21, 2010, a pharmacist employed by Walgreens 3629 in Hudson, Florida reported to the Pasco County (Florida) Sheriff's Office that an individual had attempted to fill a prescription for 270 dosage units of 30mg oxycodone, but ran from the pharmacy after learning it had contacted law enforcement, suspecting the prescription was a forgery.  Despite this incident, the same pharmacy that reported this customer to the Sheriff's Office in December continued to fill the same customer's oxycodone prescriptions in February, March, April, May, and October of 2011.

**L.     Walgreens' Internal Review Clearly Illustrates the Problem**

87.     On or about March 2011, corporate officials at Walgreens headquarters in Illinois initiated a Florida pharmacy store review initially entitled "Focus on Profit" and later changed to "Focus on Compliance."  The purpose of this review was to address the "significant increase in the number of [Schedule II controlled substance] prescriptions we are filling in [Florida]" after the October 2010 change in Florida law regarding pain clinics.  The initial pilot survey asked the following questions, amongst others: "Do pain management clinic patients come all at once or in a steady stream?" and "Do you see an increase in pain management prescriptions on the day the warehouse order is received?"  On May 17, 2011, in an email with the subject heading "Florida Focus on Profit," a Walgreens attorney reviewed the survey and regarding these two questions,

30

stated, "If these are legitimate indicators of inappropriate prescriptions perhaps we should consider not documenting our own potential noncompliance." The surveys that ultimately were used in the Focus on Compliance initiative did not contain those questions. By omitting these questions in order to avoid gathering information pertinent to whether or not pain clinic patients were engaged in diversion, the Company ignored its statutory and regulatory obligation to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels. *See* 21 U.S.C. § 823(b) and (e).

### M. Walgreens' Purported Remedial Efforts Were Disingenuous

88. Faced with regulatory scrutiny, in May 2011 Walgreens apparently surveyed some of its stores for regulatory compliance, then selectively edited the results of the survey for the explicit purpose of avoiding evidence of its own non-compliance. Additionally, the Company deliberately structured certain of its anti-diversion measures to avoid learning about and/or documenting evidence consistent with diversion. Not by coincidence, this manipulation of the compliance survey occurred just one month after the Company entered into a nationwide Memorandum of Agreement ("MOA") with the DEA to resolve an OTSC issued to a San Diego Walgreens pharmacy based on allegations of unlawful dispensing. Walgreens pledged in this MOA to enact a compliance program to detect and prevent diversion of controlled substances and to implement and maintain policies and procedures to ensure that prescriptions for controlled substances are only dispensed to authorized individuals pursuant to federal and state law and regulations. Walgreens' effort to enact such a program in Florida appears to have been, in part, intentionally skewed to avoid actually detecting certain evidence of possible diversion. Consequently, any attempts by the Company to mitigate its failings ring hollow.

**N.** **The DEA Moves to Revoke the Registrations of the Jupiter Center and Six Walgreens Pharmacies for Violating of the CSA and Posing an "Imminent Danger to the Public Health and Safety"**

**1.** **The DEA Serves an Order to Show Cause and Immediate Suspension Order Against the Jupiter Center**

89.     Based on the DEA's findings from its April 4, 2012 inspections, the DEA issued an OTSC and ISO on the Jupiter Center on September 13, 2012.  In serving the ISO, the DEA found that the Jupiter Center constituted "an imminent danger to the public safety."

90.     In support of its OTSC, the DEA identified numerous witnesses who were prepared to testify about the illegal activities at Walgreens.  The DEA also identified emails produced by Walgreens in response to its administrative subpoena in which the Company urged its Florida pharmacy supervisors to increase their oxycodone sales.  Backed by this evidence, including "detailed information provided by the [Oviedo] Chief of Police," the DEA described numerous incidents of Walgreens' pharmacies distributing controlled substances in gross disregard of red flags that the Company's customers were diverting those products for illicit use.

91.     For example, on September 27, 2010, a pharmacist working at Walgreens 04727 in Ft. Pierce, Florida reported to law enforcement that he mistakenly provided an extra 120 dosage units of 15 milligram oxycodone to a customer.  When the pharmacist tried to call the customer to request he return the mistakenly dispensed oxycodone, he was told by the customer's girlfriend that the customer was an addict who sells his pills and views the extra oxycodone as a "pot of gold" which he would not return.  Despite this incident, Walgreens 04727 filled several additional oxycodone prescriptions issued to this customer in December 2010 and January 2011.

92.     Another such instance began on November 4, 2010, when a Walgreens 04727 pharmacist reported to police that she dispensed a prescription for 60 dosage units of oxycodone

15mg to a twenty-four year old male who she then witnessed transfer the drugs to a female in the store. The female entered the pharmacy restroom, leaving behind evidence indicating she had smoked the oxycodone. Despite this incident, Walgreens 04727 continued to fill the same customer's oxycodone and alprazolam prescriptions on several occasions in November and December 2010 and January 2011.

93. Similarly, in December 2010, at Walgreens 03629 in Hudson, Florida, an individual attempted to fill a prescription for 270 thirty milligram oxycodone tablets but abruptly left the pharmacy without the narcotics he was seeking after apparently learning that pharmacy personnel, who had reviewed the prescription and suspected it was a forgery, had contacted law enforcement. Despite being put on notice that this customer was likely diverting, Walgreens 03629 continued filling prescriptions for the customer through October 2011. All of the prescriptions were for oxycodone, hydromorphone and/or alprazolam, were paid for in cash, and issued by physicians located a significant distance from Walgreens 03629.

94. In further support of its OTSC directed to the Jupiter Center, the DEA noted that on March 15, 2011, Chief Chudnow sent letters to Defendants McNally and Wasson, informing them about the numerous controlled substance arrests taking place at the Oveido Walgreens pharmacies and the effects on the community of Oveido, and asking for their assistance in stopping these problems. *See* ¶¶ 80-82, *supra.*

95. Chief Chudnow was prepared to testify about the very tangible effects that the diversion of controlled substances has had on the city of Oveido, as evidenced by increases in, among other things, crime rates and overdoses. Chief Chudnow was further prepared to testify: (i) about his department's knowledge of Walgreens 06997, as well as another Walgreens within the city limits, as centers for illicit controlled substance sales and use; and (ii) that it was his

33

practice following one of these arrests to send a letter to the pharmacy which dispensed the controlled substance being diverted, notifying them of the details and asking for the pharmacy's assistance in preventing future diversion. Chief Chudnow sent dozens of these letters.

96. Chief Chudnow was also prepared to testify about his February 10, 2011 meeting with Ed Lanzetti, Walgreens' Market Loss Prevention Director, and another Walgreens official. At the meeting, Chief Chudnow presented Mr. Lanzetti with numerous statistics and facts regarding controlled substance arrests related to Walgreens' two Oveido pharmacies. These statistics included numbers and types of drug-related arrests, types of controlled substances seized per arrest, and statistics showing the names of doctors whose prescriptions were related to diversion arrests. Despite being given this information, Walgreens 06997 continued to fill prescriptions for these associated doctors subsequent to the February 2011 meeting with Chief Chudnow.

97. The DEA also noted that on August 19, 2011, agency officials met with Walgreens personnel at the DEA offices in Weston, Florida to apprise them of relevant ARCOS information about Walgreens' sales of oxycodone in Florida. Pinon, Walgreens corporate in-house counsel, was present at the meeting. At the meeting, Walgreens' in-house counsel was told, amongst other things, that twenty Florida Walgreens pharmacies were in the top 300 of oxycodone purchasers in the United States for the first half of 2011 and that within the State of Florida over the same time frame, 100 of the top 300 pharmacy oxycodone purchasers were Walgreens retail pharmacies. Walgreens' in-house counsel was further informed that Florida Walgreens pharmacies purchased more than double the average amount of oxycodone purchased by Florida pharmacies.

98.     On October 28, 2011, the Sheriff of St. Lucie County notified Walgreens 04727 by letter that it needed to take action to stem the tide of prescription drug diversion.  St. Lucie County Sheriff Ken Mascara requested Walgreens 04727's "help in dealing the with prescription painkiller epidemic" in St. Lucie County and Florida by "closely scrutinizing" prescriptions for Schedule II narcotics, written by out-of-town physicians and/or written for out-of-town individuals.    Nevertheless, Walgreens 04727 continued its practice of filling numerous opiate/opioid prescriptions issued by out-of-town physicians through early 2012.   Several of these out-of-town physicians subsequently surrendered their registrations for cause and/or were subject to state action for their conduct involving controlled substances prescriptions.

99.     The DEA was also prepared to introduce testimony regarding a June 14, 2012 meeting between GS Federico, of the DEA Milwaukee District Office, and Pinon.  During the meeting, Pinon stated that Walgreens' prior suspicious order reporting system was based on a formula for pseudoephedrine reporting in the DEA Chemical Handlers Handbook.  Pinon stated that the old system automatically reported any orders for quantities above the algorithm's threshold limit.   He stated that DEA had informed Walgreens that this algorithm reporting system was outdated and that Walgreens needed to establish its own system for reporting suspicious orders.  Pinon stated that the old reports were not suspicious orders, but were in fact just orders that "bounced off" the old reporting system.  Pinon informed Federico that Walgreens had implemented a new system which they hoped to present to DEA at some point.  The new system set limits on a pharmacy ordering controlled substances based on their sales history, and any order over the set limit would trigger an alert to Walgreens Loss Prevention.   Loss Prevention would then resolve the order.  Pinon stated that any orders that Loss Prevention could not resolve would be reported to DEA.  However, he stated that initial implementation of this

new version of the Suspicious Order Monitoring System had produced "thousands" of allegedly suspicious orders, and was thus still being adjusted to produce different results.

100.    The DEA also was prepared to offer testimony from George Corripio concerning his thirty-one years of experience as a pharmacist, and his work as a Staff Pharmacist at Walgreens 5079 at Ft. Pierce, Florida.  Corripio was prepared to testify about a brief period in 2011 when he worked at Walgreens 4727, also located in Ft. Pierce, Florida, concerning the clientele at Walgreens 4727, which was "heavy CII traffic," and that "80% of the clientele was oxy[codone]."  In his professional opinion, the diagnoses did not match the customers, as most of the clientele were young people and most of the diagnoses were for back pain.  He felt that most of the customers were not telling the truth.  The customers were young, they seemed to all know each other, and they often appeared to be under the influence.  Often the clientele would present "cocktail prescriptions."  On one occasion, a female customer presented a prescription for ten opiates, which is the type of prescription dispensed to a patient suffering from terminal illness.

101.    Corripio was also prepared to testify about his general discomfort at filling oxycodone prescriptions at Walgreens 4727, and about how the supervising pharmacist did not seem concerned by the clientele and offered to fill prescriptions for Corripio that he felt uncomfortable filling.  She suggested that as long as the pharmacy had a diagnosis code for the prescription, they were fine to fill.  When Corripio refused to fill a prescription, the customer would often ask when the female pharmacist was coming back.  In Corripio's professional opinion, any reasonable pharmacist and technician would know that something was not right with the situation going on at the pharmacy.  Corripio brought the situation to the attention of the local police department to seek help with the problems.  Corripio was also prepared to testify that

he believed his District pharmacy supervisor knew about the dispensing practices at Walgreens 4727.

102. Based on the foregoing, the DEA concluded that "Walgreens' continued registration is inconsistent with the public interest" and that "[Walgreens'] continued registration while these proceedings are pending constitutes an imminent danger to the public health and safety."

### 2. The DEA Serves an OTSC Against Walgreens 03629

103. On November 26, 2012, the DEA issued an OTSC against Walgreens, d/b/a Walgreens 03629, 12028 Majestic Boulevard, Hudson, Florida 34667. In the OTSC, the DEA stated that "Walgreens 03629 has consistently failed to exercise its corresponding responsibility to ensure that controlled substances it dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA alleged that "Walgreens 03629 ignored readily identifiable red flags that controlled substances prescribed were being diverted and dispensed controlled substances despite unresolved red flags."

104. From late 2010 to November 2011, Walgreens 03629 dispensed oxycodone to customers who presented prescriptions with addresses and locations from 26 states outside of the State of Florida. In addition, Walgreens 03629 dispensed controlled substances, primarily in suspicious cocktail combinations of oxycodone, alprazolam, and carisoprodol to patients of at least twenty practitioners who were subjected to disciplinary action for dispensing illegitimate prescriptions for controlled substances. Most of these practitioners' registered locations were significant distances from Walgreens 03629. These practitioners include, but are not limited to, the following:

a. 354 prescriptions for controlled substances prescribed by Ramiro Abaunza, M.D ("Dr. Abaunza"), a purported pain management physician practicing in Miami, Florida. On November 7, 2011, Dr. Abaunza voluntarily surrendered his DEA registration for cause. Walgreens 03629 is over 300 miles from Miami, Florida.

b. 1,550 prescriptions for controlled substances prescribed by Robert R. Reppy, M.D. ("Dr. Reppy"), whose DEA Certificate of Registration was revoked effective November 2, 2011.

c. Fifty-two prescriptions for controlled substances prescribed by Christopher Wayne, M.D. ("Dr. Wayne") of Delray Beach, Florida. Dr. Wayne voluntarily surrendered his DEA Certificate of Registration for cause on July 15, 2011, following the emergency suspension of his Florida medical license. Walgreens 03629 is approximately 272 miles from Delray Beach, Florida.

d. Eight prescriptions for controlled substances prescribed by John T. Legowik, M.D. ("Dr. Legowik"), of Ft. Myers, Florida. Dr. Legowik voluntarily surrendered his DEA Certificate of Registration for cause on November 7, 2011, following the issuance of an Immediate Suspension Order. Dr. Legowik was arrested on April 27, 2012, and charged with illegal distribution of oxycodone and Xanax. Walgreens 03629 is approximately 178 miles from Ft. Myers, Florida.

e. Eighteen prescriptions for controlled substances prescribed by Randall Wolff, M.D. ("Dr. Wolff") of Deerfield Beach, Florida. Dr. Wolff's DEA Certificates of Registration were revoked by DEA on February 1, 2011. Walgreens 03629 is approximately 265 miles from Deerfield Beach, Florida.

f. 335 prescriptions for controlled substances prescribed by T.J. McNichol, M.D. ("Dr. McNichol") of Brandon, Florida. Dr. McNichol's DEA Certificate of Registration was revoked by DEA on September 17, 2012. Walgreens 03629 is approximately 57 miles from Brandon, Florida.

g. Forty prescriptions for controlled substances prescribed by Paul J. Glusman, D.O. ("Dr. Glusman") of Deerfield Beach, Florida. Dr. Glusman voluntarily surrendered his DEA Certificate of Registration for cause on February 2, 2011, following the issuance of an Immediate Suspension Order. Walgreens 03629 is approximately 265 miles from Deerfield Beach, Florida.

105.    The DEA further noted that pharmacy personnel at Walgreens 03620 contacted local law enforcement when, on December 21, 2010, an individual attempted to fill a prescription for 270 dosage unites of 30mg oxycodone with a forged prescription (causing the individual to abruptly depart the store). Notwithstanding that fact, Walgreens 03620

nevertheless continued to fill that same individual's prescriptions for oxycodone and other controlled substances, including the following:

a. On February 28, 2011, Walgreens 03629 filled the individual's prescription for 150 dosage units of oxycodone 30mg, for which the individual paid in cash. The prescription was issued by Ronald Heromin, M.D., a purported pain management physician practicing in Miami, Florida, which was approximately 304 miles from the individual's residence in New Port Richey, Florida.

b. On March 30, 2011, Walgreens 03629 filled the individual's prescriptions for 180 dosage units of oxycodone 30mg, 90 dosage units of hydromorphone 8 mg (a Schedule II controlled substance) and 60 dosage units of alprazolam 2 mg issued by Ronald Heromin, M.D. ("Dr. Heromin"). The individual paid in cash.

c. On April 28, 2011, Walgreens 03629 filled the individual's prescriptions for 90 dosage units of hydromorphone 8mg and 60 dosage units of alprazolam 2mg issued by Dr. Abaunza. The individual paid in cash.

d. The next day, on April 29, 2011, Walgreens 03629 filled a prescription issued to the individual for 180 dosage units of oxycodone 30mg, also issued by Dr. Abaunza, and paid for in cash.

e. On May 27, 2011, Walgreens 03629 filled the individual's prescription for 90 dosage units of hydromorphone 8mg, also issued by Dr. Abaunza and paid for in cash.

f. The next day, on May 28, 2011, Walgreens 03629 filled a prescription issued to the individual for 60 dosage units of alprazolam 2mg, also issued by Dr. Abaunza and paid for in cash.

g. On October 11, 2011, Walgreens 03629 filled the individual's prescription for 90 dosage units of diazepam 10mg (a Schedule IV controlled substance).

h. On October 13, 2011, Walgreens 03629 filled the individual's prescription for 120 dosage units of oxycodone 30 mg, issued by Albert Ford, M.D., a purported pain management physician practicing in Tampa, Florida. The individual paid in cash.

### 3. The DEA Serves an OTSC Against Walgreens 04727

106. On November 26, 2012, the DEA issued an OTSC against Walgreen Co. d/b/a Walgreens 04727, 4950 South U.S. Highway 1, Fort Pierce, Florida 34952. In the OTSC, the DEA stated that "Walgreens 04727 consistently failed to exercise its corresponding

responsibility to ensure that controlled substances it dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA alleged that "Walgreens 04727 ignored readily identifiable red flags that controlled substances prescribed were being diverted and dispensed controlled substances despite unresolved red flags."

107. The DEA further alleged that "Walgreens 04727 dispensed controlled substances when it knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where the pharmacy knew or should have known that the controlled substances were abused and/or diverted by the customer."

108. The DEA noted that on September 27, 2010, a Walgreens 04727 pharmacist reported to local law enforcement that he mistakenly provided an extra 120 dosage units of oxycodone (Schedule II) 15mg to a customer. When the pharmacist tried to call the customer to request that he return the mistakenly dispensed oxycodone, he was told by the customer's girlfriend that the customer was an addict who sells his pills and viewed the extra oxycodone as a "pot of gold" which he would not return. Despite this incident, however, Walgreens 04727 filled several additional oxycodone prescriptions issued to this customer in December 2010 and January 2011.

109. The DEA also noted that on November 4, 2010, a Walgreens 04727 pharmacist reported to police that she dispensed a prescription for 60 dosage units of oxycodone 15mg to a twenty-four-year-old male who she then witnessed transfer the drugs to a female in the store. "The female entered the pharmacy restroom with the prescription and upon leaving the restroom, left evidence indicating that she had used the oxycodone in an illicit manner." Despite this

incident, Walgreens 04727 continued to fill the same customer's oxycodone and alprazolam (Schedule IV) prescriptions on several occasions in November 2010, December 2010 and January 2011.

110.    The DEA alleged that "[s]tarting in at least 2010, Walgreens 04727 filled numerous controlled substance prescriptions despite customers exhibiting multiple 'red flags' of controlled substance diversion that were never resolved before dispensing." These "red flags" included:  multiple individuals presenting prescriptions for the same drugs in the same quantities from the same doctor; individuals with the same address presenting substantially similar prescriptions; individuals presenting prescriptions for combinations of controlled substances known to be highly abused, such as oxycodone and alprazolam; individuals presenting prescriptions for controlled substances issued by practitioners located long distances from the pharmacy; and individuals paying for prescriptions for controlled substances with cash and non-insurance discount cards.  Walgreens 04727's practice of dispensing controlled substances despite unresolved red flags includes but is not limited to the following dispensing events.

111.    The DEA provided the following instances, backed by documents and testimony, of such red flags:

   a. On June 1, 2011, within a 10-minute period, Walgreens 04727 dispensed nearly identical prescriptions for oxycodone 15mg, oxycodone 30mg, and alprazolam 2mg, to five customers all residing at the same apartment, and all with prescriptions issued by a doctor located 138 miles away in Kissimmee, Florida.

   b. On June 28, 2011, Walgreens 04727 dispensed oxycodone 30mg, oxycodone 15mg and alprazolam 2mg to three of the same person, now living at two separate new addresses, with prescriptions from the same doctor in Kissimmee, Florida.

   c. On September 21, 2011, Walgreens 04727 dispensed prescriptions for oxycodone 15mg, oxycodone 30mg, and alprazolam 2mg to two of the

individual above, along with a third, all of whom were living at a new residence, and all with new Florida identification cards issued on that same day, and all through the same doctor in Kissimmee, Florida. The DEA noted that "this dispensing event occurred one month after DEA investigators met with Walgreens representatives regarding the spike in its Florida pharmacies' oxycodone purchases and diversion red flags."

112.    Based on these examples, the DEA stated that "Walgreens 04727 knew or should have known that the vast increase of customers seeking controlled substance prescriptions created a suspicious situation requiring increased scrutiny, and nonetheless failed in carrying out its responsibilities as a DEA registrant." The DEA further stated that "Walgreens 04727 knew, or should have known, that a large number of the prescriptions for controlled substances that it filled were not issued for a legitimate medical purpose or were issued outside the usual course of professional practice." Accordingly, the DEA concluded that "Walgreens 04727 failed to exercise its corresponding responsibility regarding the proper prescribing and dispensing of controlled substances, in violation of 21 C.F.R. § 1306.04(a)."

### 4.    The DEA Serves an OTSC Against Walgreens 06997

113.    On November 26, 2012, the DEA issued an OTSC against Walgreen Co., d/b/a Walgreens 06997, 785 Lockwood Blvd., Oviedo, Florida 32765. The DEA alleged that "since at least 2010, Walgreens 06997 has dispensed controlled substances based on prescriptions issued by physicians who lacked authority to do so, in violation of 21 U.S.C. § 842(a)(l) and 21 C.P.R.§ 1306.05." As an example, the DEA noted that between December 2010 and July 2011, Walgreens 06997 filled at least 268 controlled substance prescriptions under an out-of-state registration number for a California doctor. According to the DEA, Walgreens 06997 continued to fill at least 64 of this doctor's prescription even after his out-of-state registration had expired. The DEA noted a separate instance in which, on June 6, 2011, Walgreens 06997 dispensed 30

dosage units of vyvanse (a Schedule II drug) 30mg tablets as prescribed by a doctor whose DEA registration had expired on May 31, 2011.

114.     The DEA further alleged that "Walgreens 06997 dispensed controlled substances when it knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where the pharmacy knew or should have known that the controlled substances were abused and/or diverted by the customer."  The DEA provided the following examples:

a.     Between August 10, 2010, and November 9, 2011, local law enforcement documented seventeen incidents taking place at Walgreens 06997 involving controlled substances, resulting in the arrest of thirty-five individuals for controlled substance related charges.  Chief Chudnow, discussed concerns with Walgreens, both in person and in writing, regarding the association of Walgreens 06997 with these controlled substance incidents.  In multiple letters sent to Walgreens 06997, as well as to Walgreens Corporate Headquarters, Chief Chudnow noted controlled substance-related arrests of Walgreens 06997 customers and requested Walgreens' assistance in "dealing with the prescription medication epidemic" by soliciting a commitment to stop further incidents.

i.     By letter dated November 23, 2010, Chief Chudnow advised Walgreens 06997 of the November 11, 2010 arrest of Steven Sean Reynolds for illegal distribution of Xanax (alprazolam, Schedule IV).  Reynolds had obtained the Xanax through a prescription filled by Walgreens 06997, and Chief Chudnow advised the pharmacy that the controlled substance was not used for treatment of injury or illness.

ii.     By letter dated January 19, 2011, Chief Chudnow advised Walgreens 06997 of the January 12, 2011 arrest of Frederick J. Goepel for illegal distribution of oxycodone.  The letter stated that Goepel had obtained the oxycodone from Walgreens 06997.

iii.     By letter dated January 21, 2011, Chief Chudnow advised Walgreens 06997 of the January 20, 2011 arrest of Clinton Brekke for possession of oxycodone with intent to sell.  The letter stated that Brekke had obtained the oxycodone from Walgreens 06997. Despite notification by law enforcement that Brekke was diverting his oxycodone prescription, Walgreens 06997 again dispensed oxycodone to Brekke on March 13, 2011, April 7, 2011 and April 11, 2011.  In addition, the January 21, 2011 letter also identified

Valerie Brekke as being involved in the oxycodone-related arrest. Nevertheless, Walgreens 06997 filled prescriptions for Valerie Brekke on March 16, 2011 and April 25, 2011.

iv.   By letter dated January 25, 2011, Chief Chudnow advised Walgreens 06997 of the January 21, 2011 arrest of Matthew S. Miller and Timothy Kemp Dawson for illegal distribution of oxycodone.  The letter stated that Miller and Dawson obtained the oxycodone from Walgreens 06997.

v.    By letter dated January 27, 2011, Chief Chudnow advised Walgreens 06997 of the January 26, 2011 arrest of Brian Lee Kemm for illegal distribution of oxycodone.  The letter stated that Kemm obtained the oxycodone from Walgreens 06997.  The letter further stated that the pills were illegally distributed to Staci Lynn Starling and Anna Marie Girst.  Despite the content of the letter, Walgreens 06997 distributed alprazolam, hydromorphone (Schedule II), and oxycodone to Staci Lynn Starling on February 15, 2011, March 14, 2011, and April 13, 2011.

vi.   On February 10, 2011, Chief Chudnow and other representatives of the Oviedo Police Department met with Walgreens Regional Loss Prevention Manager Ed Lanzette in order to discuss his police department's concerns with criminal activities associated with Walgreens 06997.  Chief Chudnow provided Walgreens with controlled substance arrest statistics as well as names of practitioners whose names were associated with diversion.

b.   Additionally, on February 10, 2011, Chief Chudnow met with Walgreens Loss Prevention officials in an effort to bring further awareness to the problems arising from the Oviedo Walgreens pharmacies and to brief them on the number of drug-related arrests at each of the pharmacies.  On March 15, 2011, Chief Chudnow sent identical letters to both the Chairman and CEO of Walgreens, asking them for their support and assistance in combating the prescription drug epidemic, informing them that Oviedo "has seen the parking lots of your stores become a bastion of illegal drug sales and drug use" where once the prescriptions are filled, "the drugs are sold, distributed as payment, crushed and snorted, liquefied and injected, or multiple pills swallowed while in the parking lot of your pharmacies."

115.   Based on the above, the DEA concluded that "[d]espite the specific guidance provided to Walgreens Corporation by DEA and local law enforcement, and despite the public information readily available regarding the oxycodone epidemic in Florida, Walgreens 06997 nonetheless failed in carrying out its responsibilities as a DEA registrant.  Based on the facts as

outlined above, Walgreens 06997 has failed to exercise its corresponding responsibility regarding the proper prescribing and dispensing of controlled substances in violation of 21 C.F.R. § 1306.04(a)." The DEA further concluded that "Walgreens 06997 knew, or should have known, that a large number of the prescriptions for controlled substances that it filled were not issued for a legitimate medical purpose or were issued outside the usual course of professional practice."

### 5.   The DEA Serves an OTSC Against Walgreens 03836

116.   On February 4, 2013, the DEA issued an OTSC against Walgreen Corporation d/b/a Walgreens 03836, 9332 U.S. Highway 19, Port Richey, Florida 34668. The DEA alleged that "Walgreens 03836 pharmacists repeatedly failed to exercise their corresponding responsibility to ensure that controlled substances they dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA stated that "Walgreens pharmacists ignored readily identifiable red flags that controlled substances prescribed were being diverted, and they dispensed controlled substances despite unresolved red flags." The DEA stated that "Walgreens 03836 pharmacists dispensed controlled substances when they knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where the pharmacists knew or should have known that the controlled substances were abused and/or diverted by the customer."

117.   According to the DEA, "[s]tarting in at least 2010, Walgreens 03836 pharmacists filled numerous controlled substance prescriptions despite customers exhibiting multiple 'red flags' of controlled substance diversion that were never resolved before dispensing," including:

> multiple individuals presenting prescriptions for the same drugs in the same quantities from the same doctor; individuals with the same address presenting substantially similar prescriptions; individuals presenting prescriptions for

45

combinations of controlled substances known to be highly abused, such as oxycodone and alprazolam; individuals presenting prescriptions for controlled substances issued by practitioners located long distances from the pharmacy; individuals paying for prescriptions for controlled substances with cash and non-insurance discount cards; individuals residing long distances from the pharmacy; and individuals residing long distances from the practitioners from whom the prescriptions were obtained."

118.    The DEA identified the following dispensing events, among others, at Walgreens 03836 that demonstrate an astonishing pattern of supplying vast quantities of oxycodone and other controlled substances to suspicious groups of individuals located hundreds, and even thousands of miles from their prescribing doctors and/or Port Richey, Florida:

a.    From April 2011 through July 2011, Walgreens 03836 pharmacists dispensed oxycodone, alprazolam, and hydrocodone to persons residing in Pensacola, Florida, who had obtained their prescriptions for controlled substances from Dr. Abaunza.  The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these individuals would have had to travel approximately 1,397 miles roundtrip."

b.    On April 29, 2011 and May 27, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to residents of Frankfort, Kentucky, both of whom obtained their prescriptions from Dr. Abaunza.  The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 2,242 miles roundtrip."

c.    From April 9, 2011, through May 13, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to five residents of Decatur, Tennessee who had obtained their prescriptions from Dr. Abaunza in Miami, Florida.  The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 1760 miles roundtrip."

d.    From April 12, 2011, through May 26, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to residents of Riceville, Tennessee who had obtained their prescriptions from Dr. Abaunza in Miami, Florida.  The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 1733 miles roundtrip."

e.    From April 12, 2011, through May 26, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to five residents of Athens, Tennessee who had obtained their prescriptions from Dr. Abaunza in

Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 1750 miles roundtrip."

f.  On April 15 and 16, 2011, a Walgreens 03836 pharmacist dispensed hydrocodone, alprazolam, and oxycodone to two customers, both of whom resided at the same address in Etowah, Tennessee, both of whom had obtained their prescriptions for controlled substances from Dr. Abaunza in Miami, Florida, and both of whom had obtained the prescriptions for alprazolam and oxycodone on the same day. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 1688 miles roundtrip."

g.  On or about April 23, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to a resident of Spring City, Tennessee pursuant to prescriptions issued by Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, [the customer] would have had to travel approximately 1762 miles roundtrip."

h.  On April 25, 2011, a Walgreens 03836 pharmacist dispensed oxycodone to a resident of Elora, Tennessee pursuant to a prescription issued by Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain this prescription and have it filled at Walgreens 03836, [the customer] would have had to travel approximately 1829 miles roundtrip."

i.  On or about April 30, 2011 and May 4, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to two residents of Sweetwater, Tennessee pursuant to prescriptions from Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, [the customers] would have had to travel approximately 1773 miles roundtrip."

j.  On May 4, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to a resident of Cleveland, Tennessee, pursuant to prescriptions issued by Dr. Abaunza in Miami, Florida. In order to obtain these prescriptions and have them filled at Walgreens 03836, [the customer] would have had to travel approximately 1665 miles roundtrip.

k.  In April 2011 and May 19, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to R.M., a resident of Cedartown, Georgia pursuant to prescriptions from Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, [the customer] would have had to travel approximately 1544 miles roundtrip."

l.  On April 30, 2011 and May 3, 2011, a Walgreens 03836 pharmacist dispensed oxycodone and hydrocodone to two customers who resided at the same address in Lilburn, Georgia, pursuant to prescriptions from Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 1457 miles roundtrip."

m.  On May 2, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to two residents of Columbus, Ohio, pursuant to prescriptions from Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 2490 miles roundtrip."

n.  On May 3, 2011, a Walgreens 03836 pharmacist dispensed oxycodone, hydrocodone, and alprazolam to two customers residing at the same address in Hamersville, Ohio pursuant to prescriptions obtained from Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these customers would have had to travel approximately 2390 miles roundtrip."

o.  On April 19 and 26, 2011, a Walgreens 03836 pharmacist dispensed hydrocodone and alprazolam to a resident of Dothan, Alabama pursuant to prescriptions obtained from Dr. Abaunza in Miami, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, [the customer] would have had to travel approximately 1219 miles roundtrip."

p.  On April 21 and 23, 2011, a Walgreens 03836 pharmacist dispensed controlled substances, including large quantities of fifteen-milligram tablets of oxycodone and two milligram tablets of alprazolam, to seven residents of Kentucky, two of whom resided at the same address. All of these individuals obtained their prescriptions for the controlled substances from either Charles Kessler, M.D. ("Dr. Kessler"), who was practicing in Plantation, Florida, or Richard Vitalis, D.O. ("Dr. Vitalis"), who was practicing in North Lauderdale, Florida. The DEA noted that "[i]n order to obtain these prescriptions and have them filled at Walgreens 03836, these seven individuals would have had to travel between approximately 1987 and 2189 miles roundtrip." The DEA also noted that Walgreens distributed oxycodone to one customer despite dispensing information indicating an allergy to opioid analgesics.

q.  On April 14, 2011, Walgreens 03836 pharmacists dispensed large quantities of oxycodone and alprazolam to four customers residing at the same address in Kissimmee, Florida within five and ten minutes of each other. These individuals obtained their prescriptions for controlled substances from Dr. Vitalis, whose office was located in North Lauderdale, Florida, approximately 288 miles from Walgreens 03836. The DEA noted that "[i]n order to obtain

these prescriptions and have them filled at Walgreens 03836, these individuals would have had to travel approximately 578 miles roundtrip."

r. On April 28 and May 5 of 2011, Walgreens 03836 pharmacists dispensed controlled substances in nearly identical amounts to four individuals, all of whom resided at the same address in Kissimmee, Florida. The oxycodone prescriptions were dispensed within eight minutes of each other. All of these prescriptions were obtained from Dr. Vitalis in North Lauderdale, Florida, approximately 288 miles from Walgreens 03836. In order to obtain these prescriptions and have them filled at Walgreens 03836, these individuals would have had to travel approximately 603 miles roundtrip.

s. On April 27, 2011, the same Walgreens 03836 pharmacist dispensed two oxycodone prescriptions and a prescription for alprazolam to two of the individuals mentioned in the preceding paragraph. The alprazolam prescriptions were dispensed within nine minutes of each other. The oxycodone prescriptions were dispensed within two minutes of each other. With respect to the oxycodone prescriptions, the controlled substances were packaged in a container bearing an incorrect dispensing date in violation of 21 C.F.R. § 1306.14(a). In order to obtain these prescriptions and have them filled at Walgreens 03836, these individuals would have had to travel between approximately 583 and 587 miles roundtrip.

t. From April 9, 2011, through May 18, 2011, Walgreens 03836 pharmacists dispensed approximately 61 prescriptions for oxycodone, 31 prescriptions for alprazolam, and seven prescriptions for methadone to persons who obtained their prescriptions from Dr. Kessler and who resided in the State of Kentucky. Moreover, on May 12, 2011, one or more Walgreens 03836 pharmacists dispensed oxycodone to five Kentucky residents and two residents of Pensacola, Florida, all of whom obtained their prescriptions from Dr. Kessler. With respect to three of the Kentucky residents who obtained controlled substances from Walgreens 03836 pharmacists on May 12, 2011, their oxycodone prescriptions were dispensed within a 17-minute period.

u. An analysis of patients who obtained prescriptions for controlled substances from Dr. Kessler and had them filled at Walgreens 03836 shows that, out of 140 different customers, 72% of the customers resided more than 250 miles from Walgreens 03836, 60% resided more than 400 miles from Walgreens 03836, and 51% resided more than 700 miles from Walgreens 03836.

v. From April 5, 2011, through July 20, 2011, Walgreens 03836 pharmacists dispensed controlled substances including, but not limited to, oxycodone, hydrocodone, and alprazolam, on 55 occasions to persons who obtained their prescriptions from Dr. Heromin. At the time these controlled substances were distributed, Dr. Heromin was practicing at offices in Miami and Doral, Florida.

      i.    Of the 55 prescriptions dispensed, at least 16 prescriptions for Schedule II controlled substances contained no patient address in violation of 21 C.F.R. §§ 1306.05(a) and 1306.11(a), as well as FLA. STAT. § 893.04(l)(c)(1).  At least nine prescriptions for Schedule IV controlled substances contained no patient address in violation of 21 C.F.R. §§ 1306.05(a) and 1306.21(a), as well as FLA. STAT. § 893.04(1)(c)(1);

     ii.    Of the 25 prescriptions which lacked a patient address, eleven prescriptions for oxycodone and five prescriptions for alprazolam were issued to persons residing in Pensacola, Florida, which is approximately 412 miles from Walgreens 03836, and at least 670 miles from either of Dr. Heromin's offices in Doral and Miami, Florida.  Moreover, on April 30, 2011, a Walgreens 03836 pharmacist distributed thirty milligram tablets to five individuals who obtained their prescriptions from Dr. Heromin, four of whom were residing in Pensacola, Florida, and one of whom was residing in Wetumkka, Alabama.  The prescriptions were for quantities of either 180 or 210 tablets each, and all five prescriptions were filled within a 12-minute period by the same pharmacist.  In order for the four Pensacola residents to obtain these prescriptions and have them filled at Walgreens 03836, they would have had to travel approximately 1388 miles roundtrip and the patient from Wetumpka, Alabama, would have had to travel approximately 1438 miles roundtrip.

w.   On April 27, 2011, August 19, 2011, June 21, 2011, October 10, 2011, and November 5, 2011, a Walgreens 03836 pharmacist dispensed at least five prescriptions to two individuals that contained no patient address in violation of 21 C.F.R. §§ 1306.05(a) and 1306.11(a), as well as F.S.A. § 893.04(l)(c)(l).

x.   From April 9, 2011, through July 19, 2011, Walgreens 03836 pharmacists dispensed controlled substances including, but not limited to, oxycodone, hydrocodone, and alprazolam, pursuant to 138 different prescriptions issued to individuals residing in Pensacola, Florida.  All but three of these prescriptions had been issued by physicians practicing in South Florida, including Drs. Abaunza, Kessler, Vitalis, and Heromin.  In order to obtain these prescriptions and have them filled at Walgreens 03836, these individuals would have had to travel between approximately 1341 and 1397 miles roundtrip.

y.   From April 9, 2011, through February 28, 2012, Walgreens 03836 pharmacists dispensed approximately 81 prescriptions for controlled substances to individuals residing in Tennessee.  The majority (68%) of those prescriptions were issued by physicians practicing in either Doral or Miami, Florida, both of which are more than 270 miles from Walgreens 03836.

z.   From April 9, 2011, through January 28, 2012, Walgreens 03836 pharmacists dispensed approximately 149 prescriptions for controlled substances to

individuals residing in Kentucky. Approximately 92% of those prescriptions were issued by physicians practicing in South Florida cities located more than 250 miles from Walgreens 03836.

aa. On April 29, 2011, a Walgreens 03836 pharmacist dispensed 300 four-milligram tablets of hydromorphone to an individual. On May 13, 2011, a Walgreens 03836 pharmacist dispensed hydromorphone to another individual. On June 1, 2011, a Walgreens 03836 pharmacist dispensed 1080 four-milligram tablets of hydromorphone and 300 forty-milligram tablets to oxycodone to that same individual. All of the above described controlled substances in this paragraph were dispensed pursuant to prescriptions that contained no patient address in violation of 21 C.F.R. §§ 1306.05(a) and 1306.11(a), as well as FLA. STAT. § 893.04(1)(c)(l). Additionally, the controlled substances provided to the second individual on May 13, 2011, were mislabeled insofar as the container displayed an incorrect dispensing date in violation of 21 C.F.R. § 1306.14(a) and FLA. STAT. § 893.04(l)(e)(2).

bb. During January 2011, one or more Walgreens 03836 pharmacists dispensed controlled substances to approximately twenty-two different individuals who presented fraudulent prescriptions that contained no patient address in violation of 21 C.F.R. § 1306.124(a) and FLA. STAT. § 893.04(1)(e)(2). During December 2010, one or more Walgreens 03836 pharmacists dispensed controlled substances to approximately six individuals who presented fraudulent prescriptions that contained no patient address.

### 6. The DEA Serves an OTSC Against Walgreens 04391

119. On February 11, 2013, the DEA issued an OTSC against Walgreen Co. d/b/a Walgreens 04391, 2501 Virginia Avenue, Fort Pierce, Florida 34981. The DEA alleged that "Walgreens 04391 pharmacists repeatedly failed to exercise their corresponding responsibility to ensure that controlled substances they dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA stated that "Walgreens pharmacists ignored readily identifiable 'red flags' that controlled substances were being diverted and/or abused, and they dispensed controlled substances despite unresolved 'red flags.'"

120. According to the DEA, between January 1, 2010 and April 4, 2012, Walgreens 04391 pharmacists filled numerous prescriptions for controlled substances despite "red flags"

indicating a risk of controlled substance diversion and/or abuse. Such "red flags" included the following:

> multiple individuals presenting prescriptions for the same drugs in the same quantities from the same practitioner; individuals presenting prescriptions for combinations of controlled substances known to be highly abused, such as oxycodone and benzodiazepines; individuals presenting prescriptions for controlled substances issued by practitioners located long distances from the pharmacy; individuals presenting prescriptions for controlled substances issued by multiple practitioners, or "doctor shoppers"; and warnings documented by pharmacy employees regarding physicians prescribing illegitimately.

121.    The DEA provided the following examples of "Walgreens 04391's practice of dispensing controlled substances despite unresolved 'red flags'":

a. Between July 6, 2010 and March 22, 2012, Walgreens 04391 pharmacists filled at least forty prescriptions for hydrocodone, oxycodone 30mg, oxycodone 60mg, and oxycodone 80mg for a customer who obtained these prescriptions from ten different physicians, seven of whom were located in Miami, Florida, approximately 144 miles away from Walgreens 04391. At least four of the above-referenced oxycodone prescriptions were issued by Dr. Armando Falcon ("Dr. Falcon") and dispensed despite the following warning printed on the prescription label beneath Dr. Falcon's name and recorded in the pharmacy's electronic dispensing log: "FAKE CII DO NOT FILL CANDY DR."

b. On February 3, 2012 and February 11, 2012, Walgreens 04391 pharmacists filled two prescriptions for oxycodone issued by Dr. Dustin Lee ("Dr. Lee") despite the following warning printed on the prescription label beneath Dr. Lee's name and recorded in the pharmacy's electronic dispensing log: "FAKE CII DO NOT FILL CANDY DR ***FAKE."

c. Between February 28, 2011 and February 3, 2012, Walgreens 04391 pharmacists filled at least twenty-eight prescriptions for oxycodone and Schedule IV benzodiazepines for a customer who obtained the prescriptions from four different physicians, three of whom were located in Miami, Florida, approximately 140 miles away from the pharmacy. On January 4, 2012 and February 3, 2012, Walgreens 04391 dispensed oxycodone to this customer despite the following warning printed on the prescription label underneath Dr. John Wolf's ("Dr. Wolf") name and recorded in the pharmacy's electronic dispensing log: "DO NOT FILL ANY FILL ANY CII."

d. On January 19, 2011, a Walgreens 04391 pharmacist(s) filled eleven prescriptions for oxycodone and alprazolam cocktails to five different customers, all prescribed by Dr. Ralph Miniet ("Dr. Miniet"), who is located

in Fort Lauderdale, Florida, approximately 100 miles away from the pharmacy. According to the time stamp on the prescription labels, all six of the oxycodone prescriptions were dispensed within a ten minute time period.

### 7.     The DEA Serves an OTSC Against Walgreens 03099

122.    On February 19, 2013, the DEA issued an OTSC against Walgreen Co. d/b/a Walgreens 03099, 1525 Colonial Boulevard, Fort Myers, Florida 33907. The DEA alleged that "Walgreens 03099 pharmacists repeatedly failed to exercise their corresponding responsibility to ensure that controlled substances they dispensed were dispensed pursuant to prescriptions issued for legitimate medical purposes by practitioners acting within the usual course of their professional practice." The DEA stated that "Walgreens 03099 pharmacists ignored readily identifiable red flags that controlled substances prescribed were being diverted, and they dispensed despite unresolved red flags."

123.    The DEA further stated that "Walgreens 03099 pharmacists dispensed controlled substances when they knew or should have known that the prescriptions were not issued in the usual course of professional practice or for a legitimate medical purpose, including circumstances where the pharmacists knew or should have known that the controlled substances were abused and/or diverted by the customer." For example:

a.    On September 27, 2010, Fort Myers police received a 911 call from Walgreens 03099 regarding a customer, whose identity was known to Walgreens 03099, who appeared to be under the influence of drugs and was trying to buy syringes. A trespass warning was issued to the customer. Despite this incident, Walgreens 03099 pharmacists filled oxycodone, morphine and alprazolam prescriptions for this customer on numerous occasions between February 3, 2011 and October 10, 2011.

b.    On September 28, 2010, Fort Myers police documented that a Walgreens 03099 customer, whose identity was known to Walgreens 03099, engaged in a drug deal on the premises of Walgreens 03099 by selling for money controlled substances he had just purchased from Walgreens 03099. The customer had just filled prescriptions for oxycodone and alprazolam that he paid for using cash and with a Walgreens discount card. Nevertheless, Walgreens 03099

pharmacists filled oxycodone and alprazolam prescriptions for this customer on numerous occasions between September 28, 2010 and June 13, 2011.

124.    The DEA further stated that "[s]ince at least 2010, Walgreens 03099 pharmacists filled numerous controlled substance prescriptions despite customers exhibiting multiple "red flags" of controlled substance diversion that were not resolved before dispensing.' These "red flags" included:

> multiple individuals presenting prescriptions for the same drugs in the same quantities from the same doctor; individuals with the same address presenting substantially similar prescriptions; individuals presenting prescriptions for combinations of controlled substances known to be highly abused, such as oxycodone, alprazolam and carisoprodol; individuals from out-of-state or who had travelled significant distances within state to fill prescriptions at Walgreens 03099; and filling new oxycodone prescriptions for customers when fewer than 30 days had elapsed since the customer had filled their previous prescription for a 30-day supply of oxycodone.

125.    The DEA listed the following "dispensing events" as examples of "Walgreens 03099's practice of dispensing controlled substances despite unresolved red flags":

> a.  From January 5, 2011 through October 11, 2011, Walgreens 03099 pharmacists filled approximately forty-two prescriptions for oxycodone 15mg and 30mg, alprazolam 2mg, carisoprodol 350mg, morphine sulfate 30mg and 60mg and zolpidem 10mg for one customer. From December 20, 2010 through October 24, 2011, Walgreens 03099 pharmacists filled approximately thirty-four prescriptions for oxycodone 15mg and 30mg, alprazolam 2mg, carisoprodol 350mg, morphine sulfate 30mg and diazepam 5mg and 10mg for another customer. Both customers resided at the same address in Fort Myers, Florida and both received their prescriptions from the same physician, Dr. Emiliya Hill, M.D. ("Dr. Hill").

> b.  From August 8, 2011 through October 31, 2011, Walgreens 03099 pharmacists filled 29 prescriptions for oxycodone, morphine sulfate, and diazepam for three customers who all resided at the same address in Fort Myers, Florida and all received their prescriptions from Dr. Hill.

> c.  From April 12, 2011 to May 12, 2011, pharmacists at Walgreens 03099 filled four prescriptions of oxycodone for one individual, including 240 dosage units of 15mg oxycodone and 420 dosage units of 30-mg oxycodone. Walgreens 03099 pharmacists also filled alprazolam and carisoprodol prescriptions on at least two occasions. All prescriptions were written by Dr. Hill.

    d.  On December 19, 2010, and January 14, February 11, March 11, April 7, May 5, June 2, June 30, July 28, and August 24, 2011, Walgreens 03099 pharmacists filled prescriptions for 90 dosage units of oxycodone 15mg for one customer. All but one of these prescriptions were written by Dr. Hill except for the April 7, 2011 prescription which was written by Natalya Verbinskaya, M.D. Also, on December 18, 2010, and January 15, 2011, Walgreens 03099 pharmacists filled prescriptions for 42 dosage units of alprazolam 2mg for the same customer pursuant to prescriptions written by Dr. Hill. Also, on February 11, March 11, April 7, May 5, June 2, June 30, July 28, and August 24, 2011, Walgreens 03099 pharmacists filled prescriptions for 56 dosage units of alprazolam 2mg for customer the same customer. All but one of these prescriptions were written by Dr. Hill.

    e.  From December 2010 through October 2011, Walgreens 03099 pharmacists filled identical, or nearly identical, prescriptions for oxycodone for three family members, two of whom sometimes filled their prescriptions at Walgreens 03099 on the same day. These prescriptions were issued by three physicians who practiced at Southwest Medical Solutions, a pain clinic in Bonita Springs, Florida.

**8.    The DEA Compiled Substantial Evidence of Wrongdoing in Support of its OTSC**

126.    The DEA was prepared to offer numerous witnesses and documentary evidence to support its claims that Walgreens has violated the CSA. For example, in support of its OTSC against Walgreens stores 03629, 04727, and 06997, the DEA proposed to offer ten witnesses: (1) Susan Langston, Diversion Group Supervisor, DEA ("DI Langston"); (2) Gayle Lane, Group Supervisor, Miami Field Division, DEA ("GS Lane"); (3) Janet E. Pascalli, Task Force Officer, DEA ("Officer Pascalli"); (4) Donna G. Richards, Diversion Investigator, DEA ("DI Richards"); (5) Peter Flagg, Diversion Investigator, DEA; (6) Caren Cohalla, Pharmacist, Walgreens; (7) Stuart Eakins, Pharmacy Manager, Walgreens; (8) Patricia Gibson, Pharmacy Manager, Walgreens; (9) Mary E. Chmielewski Ph.D. ("Dr. Chmielewski"), Senior Personnel Psychologist, DEA; (10) Paul L. Doering ("Prof. Doering"), Distinguished Service Professor of Pharmacy Practice, Emeritus, College of Pharmacy, University of Florida.

127. DI Langston was prepared to testify "that DEA investigators advised Walgreens about specific red flags for diversion related to patients, specifically, out-of-state patients, questionable Florida identification cards, cocktail prescriptions for oxycodone 15mg, oxycodone 30mg, alprazolam 2mg, and carisoprodol, customers under the age of 45 and customers paying for prescriptions with cash." She was also prepared to testify "that Walgreens #03629 was put on notice that there would be a vast increase of customers seeking controlled substance prescriptions, particularly those involving oxycodone, for no legitimate medical purpose" and that Walgreens 03629 has dispensed controlled substances to customers residing in numerous states outside of Florida.

128. GS Lane was prepared to testify that on August 19, 2011, the DEA met with Walgreens representatives and that she and DI Langston advised Walgreens of customer- and physician-specific red flags to look for prior to dispensing prescriptions for controlled substances. GS Lane was also prepared to testify that on April 4, 2012, the DEA served an AIW on Walgreens 03629 and obtained inventory records, prescriptions, logs, and other records. GS Lane was prepared to testify that Walgreens 03629's dispensing log revealed that it filled prescriptions issued by doctors who routinely prescribed oxycodone and alprazolam "cocktails", who were located significant distances away from the pharmacy, and whose patients paid for their prescriptions with cash.

129. Officer Pascalli was prepared to testify that in her capacity as Detective for the Pasco County Sheriff's Office, her office received numerous reports regarding individuals who would frequent Walgreens 03629 because of the ease with which they could get combination controlled substance prescriptions filled. Officer Pascalli was further prepared to testify that the PCSO received additional information that Walgreens 03629 became a favorite location for

traffickers of prescription drugs and that some of these individuals would travel great distances to fill questionable prescriptions, primarily for oxycodone and alprazolam. Officer Pascalli was prepared testify to numerous calls received by local law enforcement from Walgreens 03629 about individuals who attempted to fill phony prescriptions.

130.    DI Richards was prepared to testify that despite being put on notice that a customer of Walgreens 03629 had been arrested for forging prescriptions on April 9, 2011, Walgreens 03629 continued filling prescriptions for that customer through October 2011. All of the prescriptions were for oxycodone, hydromorphone and/or alprazolam, were paid for in cash and issued by physicians located a significant distance from Walgreens 03629.

131.    Mr. Flagg was prepared to testify that on April 4, 2012, the DEA executed an AIW at Walgreens 03629. During the execution of the AIW, investigators obtained inventory records, copies of all Schedule II prescriptions, and dispensing records for Schedule II-IV controlled substances dispensed between January 1, 2010 and April 4, 2012. Mr. Flagg was prepared to testify that a review of the records revealed that Walgreens 03629 filled prescriptions that should have raised concerns or red flags to the pharmacists. Specifically, Walgreens 03629 filled prescriptions issued by doctors who routinely prescribed oxycodone, alprazolam and Soma (carisoprodal) cocktails, practiced outside their specialties, and were located significant distances away from the pharmacy.

132.    Ms. Cohalla was expected to testify to prescriptions filled by Walgreens 03629 by other individuals residing in distant locations such as Ohio, Kentucky, Tennessee, Colorado, and Missouri.

133. Mr. Eakins was expected to testify regarding Walgreens 03629's filling of subsequent prescriptions for a customer through October 2011 despite that customer's previous history of prescription fraud and their having travelled a long distance to fill these prescriptions.

134. Ms. Gibson was expected to testify regarding Walgreens 03629's procedure for filling central filled prescriptions and the pharmacy's failure to properly execute these prescriptions with the "CENTRAL FILL" designation as required by 21 C.F.R. § 1306.27(a).

135. Dr. Chmielewski was prepared to testify regarding her analysis of oxycodone purchase data by Walgreens 03629. Through that analysis, she determined that a statistically significant difference for orders from 2006 through 2011 was greater than what would be expected to occur due to chance or probability.

136. Prof. Doering was prepared to discuss his analysis of Walgreens 03629's controlled substance dispensing between January 1, 2010 and April 4, 2012 and that the sheer number of controlled substance prescriptions filled per day can be an indicator that something might by awry.

137. The DEA was prepared to offer similar evidence and testimony in its OTSC against Walgreens 04727. For example, GS Lane was prepared to testify regarding a letter she obtained from St. Lucie County Sheriff's Office dated October 28, 2011 from Sherriff Ken Mascara to Walgreens 04727 requesting help in dealing the with prescription painkiller epidemic in St. Lucie County and Florida by "closely scrutinizing" prescriptions for Schedule II narcotics, written by out-of-town physicians and/or written for out-of town individuals.

138. GS Lane was also prepared to testify that on August 23, 2012, she and other DEA investigators and DEA Chief Counsel attorneys interviewed Walgreens pharmacist George Corripio. In his interview, Mr. Corripio stated that:

[A]s soon as he was transferred to the store he immediately wanted to leave due to the heavy oxycodone traffic. Mr. Corripio said that "80% of clientele was oxy" and that he thought it was "terrible." Mr. Corripio said the oxycodone prescriptions were mainly for young people with diagnoses of lower back pain, that the pain clinics all gave the same lower back pain diagnosis for patients, and that the customers appeared to be under the influence of controlled substances. Mr. Corripio said that "nothing felt right" and he did not think the customers or the doctors were being truthful about the prescriptions.

Mr. Corripio stated that Respondent's Pharmacy Manager, Andrea Cohen, tried to alleviate his concerns regarding filling the oxycodone prescriptions. She told him to call the doctor, write a diagnosis code, and then "we will be fine." Mr. Corripio said he did not believe the diagnosis codes fit the customers. Mr. Corripio said he would fill one person's prescriptions, and immediately three to four other customers would come to the pharmacy with similar prescriptions. Moreover, when he would call the doctor's office, some person at the clinic who was not the doctor would rattle of the same diagnosis for all the patients. Mr. Corripio said Ms. Cohen filled the Schedule II narcotic prescriptions that he felt uncomfortable filling. Mr. Corripio said testify Ms. Cohen also filled the prescriptions that the floater pharmacists would not fill. Mr. Corripio told DEA investigators that when he refused to fill a prescription, customers would get angry and ask when the "lady" pharmacist was coming back.

139. The DEA also proposed to make Mr. Corripio a witness at the hearing, at which "Mr. Corripio will testify that oxycodone dispensing at Walgreens 04727 was 'out of control' and he told Fort Pierce police that he needed help. He said pharmacy personnel were aware of the problem, especially after receiving a letter from the St. Lucie County Sheriff's Office."

140. The DEA was prepared to offer similar evidence and testimony in its OTSC against Walgreens 06997. For example, Diversion Investigator Deborah George ("DI George") was prepared to testify that the Oviedo Police Department sent "multiple letters sent from the chief of police, Jeffrey Chudnow, to Walgreens 06997 informing the pharmacy that customers, to whom they had dispensed controlled substances, were arrested and charged criminally with illegal distribution of the very controlled substances dispensed by Walgreens #06997." DI George obtained copies of the same letters, compared the names of the arrestees to the dispensing logs for Walgreens 06997, and able to corroborate that the arrestees were in fact

supplied with controlled substances from Walgreens 06997. DI George also found that despite the content of the letters from Chief Chudnow, Walgreens 06997 filled controlled substance prescriptions for some of the arrested customers subsequent to these arrests and notifications to Walgreens 06997.

141. In addition, Chief Chudnow was prepared to testify that "it was his practice following one of these arrests to send a letter to the pharmacy which dispensed the controlled substance being diverted, notifying them of the details and asking for the pharmacy's assistance in preventing future diversion. Chief Chudnow sent dozens of these letters, at least five of which will be offered into evidence, because Walgreens #06997 continued to dispense to some of these individuals even after being notified of their arrest."

142. Chief Chudnow was also prepared to testify that on February 10, 2011, he met with Ed Lanzetti, Walgreens Market Loss Prevention Director, and another Walgreens official. At the meeting, Chief Chudnow presented Mr. Lanzetti with numerous statistics and facts regarding controlled substance arrests related to Walgreens' two Oveido pharmacies, including numbers and types of drug-related arrests, types of controlled substances seized per arrest, and statistics showing the names of doctors whose prescriptions were related to diversion arrests. Chief Chudnow was prepared to testify that despite being given this information, Walgreens 06997 continued to fill prescriptions for these associated doctors subsequent to the February meeting with Chief Chudnow.

143. Chief Chudnow was also prepared to testify that on March 15, 2011, he sent letters to McNally and Wasson informing them about the numerous controlled substance arrests taking place at the Oveido Walgreens pharmacies, and asking for their assistance and that he never received any response to his request for assistance from anyone at Walgreens.

144. Finally, in connection with the OTSCs and ISO, the DEA was prepared to offer more than three hundred exhibits (consisting of thousands of pages), which it listed in its filings, attached hereto as Exhibit 1. These exhibits included the following:

a. The DEA's guidance letters sent to Walgreens on September 27, 2006, February 7, 2007, and December 27, 2007, *see* ¶ 53, *supra*;

b. Letters from Walgreens legal counsel to DEA enforcement personnel;

c. Letters send from Oviedo Police Department to Walgreens;

d. Monthly Serious Order Reports from the Jupiter Center and individual Walgreens pharmacies;

e. Excerpts of dispensing logs concerning prescriptions, drug cocktails, distances travelled, and customers coming from the same address;

f. Reports of prescriptions issued by certain physicians;

g. Maps and mileage information detailing distances between customers, physicians, and pharmacies;

h. Summaries of arrests and surveillance at Walgreens pharmacies in Oviedo, Florida;

i. Pasco County Police report; and

j. Numerous emails with topics such as "Oxycodone sales," "Re: High Quantity Stores 682971," "Fw_Stores with many adjustments," "Re Fw Oxycontin question," "Florida Focus on Profit," "Dist #227 Oxycodone Memo August 2011," and "REQUEST REVIEW Florida Pain Management Visits," "Re Please advise on Pain Manag," "Standards of Practice for the Disp," "Re_Handling Pain Management RX," "New Florida Prescribing Law," "Focus on Compliance Survey Results," and "The Two Minute Oxy-Refusal," and "Re Fw CII Order."

**O.      Walgreens Settles With the DEA and Agrees to Pay $80 Million in Civil Penalties**

145. On June 11, 2013, the DEA announced that Walgreens had agreed to pay $80 million in civil penalties, resolving the DEA's administrative actions and the United States Attorney's Office's civil penalty investigation regarding the Jupiter Center and six Walgreens retail pharmacies in Florida. The 2013 Settlement further resolved similar open civil

investigations in the District of Colorado, Eastern District of Michigan, and Eastern District of New York, as well as civil investigations by DEA field offices nationwide.

146.    In connection with the 2013 Settlement, the DEA, DOJ, and Walgreens entered into the 2013 Settlement Agreement, in which Walgreens expressly acknowledged, among other things, that certain of its stores had distributed controlled substances in violation of the law:

> Walgreens acknowledges that suspicious order reporting for distribution to certain pharmacies did not meet the standards identified by DEA in three letters from DEA's Deputy Assistant Administrator, Office of Diversion Control, sent to every registered manufacturer and distributor, including Walgreens, on September 27, 2006, February 7, 2007 and December 27, 2007.  Furthermore, Walgreens acknowledges that certain Walgreens retail pharmacies did on some occasions dispense certain controlled substances in a manner not fully consistent with its compliance obligations under the CSA (21 U.S.C. §§ 801 *et seq.*) and its implementing regulations (21 C.F.R. Part 1300 *et seq.*).  Finally, Walgreens acknowledges that its recordkeeping practices regarding the dispensing of controlled substances from certain retail pharmacies utilizing its CPO Facilities as central-fill pharmacies did not require such original prescriptions to be marked "CENTRAL FILL."

2013 Settlement Agreement, Ex. 1, at 2-3.

147.    On July 17, 2013, the U.S. Attorney's Office for the Eastern District of New York made public its own investigation of Walgreens when it announced the guilty plea of nurse practitioner Eva MacDowall ("MacDowall").  MacDowall, who was prosecuted by the Suffolk County District Attorney's Office, pled guilty in Suffolk County Court to one charge of criminal possession of a forged instrument in the second degree in connection with her writing a false prescription for oxycodone that she filled at a Walgreens pharmacy in Selden, New York, on June 8, 2012.  The investigation and prosecution of MacDowall revealed that Walgreens repeatedly violated the CSA by filling numerous prescriptions that Walgreens employees knew, or should have known, were not issued for a legitimate medical purpose.  Over a two-year period from July 2010 until July 2012, MacDowall filled 94 different, illegitimate prescriptions –

primarily for two highly addictive painkillers, oxycodone and hydrocodone – at a Walgreens pharmacy in Selden and two Walgreens pharmacies in Medford.

**P.     Investigations and Regulatory Actions Concerning Walgreens in Other States Reveal Further Misconduct**

148.    Walgreens' pattern of regulatory violations extends beyond Florida and provides a further indication of the Board's utter failure to prevent the unlawful distribution of controlled substances.  As noted above, the 2013 Settlement Agreement not only resolved administrative actions by the DEA concerning Walgreens' operations in Florida, but also civil investigations by the DOJ in the Eastern District of New York, the Southern District of Florida, the District of Colorado and the Eastern District of Michigan, as well as civil investigations by the DEA nationwide.

149.    Further, on December 28, 2010, the Colorado State Board of Pharmacy (the "Colorado Board") and Walgreens 10118 entered into a Stipulation and Final Agency Order, following a "controlled substance and prescription drug audit" conducted by the Colorado Board between November 16, 2009 and January 31, 2010.  In the Stipulation, Walgreens 10118 admitted that "inspectors discovered deficiencies involving the overall controlled substance recordkeeping at [Walgreens 10118], some of which caused the inspectors to leave various prescriptions and other data out of the Audit, making performance of an accurate accounting of controlled substance and prescription drugs impossible."

150.    The Colorado Board found, and Walgreens 10118 admitted to, the following deficiencies: (a) inspectors were unable to locate Walgreens 10118's initial controlled substances inventory; (b) several daily printouts were not available for inspection; (c) "inter-store transfers" between Walgreens pharmacies lacked the required information; and (d) various prescription orders involved in the audit were not uniformly maintained in hard-copy form.  As a result of the

Colorado Board's finding and the stipulation, Walgreens 10118 was placed on three years' probation and required to submit quarterly affidavits of compliance with applicable rules and regulations.

151.    Likewise, on September 12, 2012, California' Board of Pharmacy, Department of Consumer Affairs brought an Accusation against Walgreens 06683, located in Visalia, California, and a pharmacist at Walgreens 06683, for inadequate pharmacy security and failure to report the loss of approximately 23,277 tablets of hydrocodone-containing medications and approximately 2,767 tablets of oxycodone.

## VI.    DERIVATIVE ALLEGATIONS

152.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

153.    Plaintiff brings this action derivatively pursuant to Rule 23.1 of the Federal Rules of Civil Procedure in its right and for the benefit of Walgreens to redress injuries suffered, and to be suffered, by Walgreens as a direct result of the breaches of fiduciary duties by the Individual Defendants.

154.    Plaintiff will adequately and fairly represent the interests of Walgreens and its shareholders in enforcing and prosecuting its rights, and it has retained counsel experienced in prosecuting this type of action.

155.    Walgreens is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156.    As alleged above, Plaintiff is and was a stockholder of Walgreens at the time of the breaches of fiduciary duties complained of and will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.  Because

the Individual Defendants face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its shareholders.

157.    The wrongful acts complained of herein subjected, and continue to subject, Walgreens to harm.

## VII.    DEMAND ON THE BOARD OF DIRECTORS WOULD BE FUTILE

158.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as though they were fully set forth herein.

159.    At the time this action was initiated, the Board was comprised of thirteen directors: Defendants Skinner, Wasson, Babiak, Brailer, Davis, Foote, Frissora, Graham, McNally, Murphy, Pessina, Schlichting, and Silva.  Plaintiff did not issue a demand upon the Individual Defendants prior to instituting this action because a majority of the Individual Defendants either: (a) engaged in conduct that is not a legitimate exercise of business judgment and/or is *ultra vires* and, therefore, cannot enjoy the protections of the business judgment rule; and/or (b) would have been "interested" in (and therefore conflicted from and unable to fairly consider) a demand because they face a substantial likelihood of liability for their role in Walgreens' illegal conduct.

### A.    Demand Is Excused Because the Individual Defendants' Conduct Is Not a Valid Exercise of Business Judgment

160.    The challenged misconduct at the heart of this case involves the direct facilitation of illegal activity, including knowingly and consciously presiding over the Company's violations of the CSA.  As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of law.  Such a strategy is not a legally protected business decision and such conduct

can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

161. A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment – conduct for which the Board should face potential personal liability. As noted by the DEA, selling controlled substances in "staggering disregard" of the CSA constitutes an "imminent danger to the public health and safety." Such misconduct cannot under any circumstances be considered legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever involve the "good faith" exercise of directorial authority.

162. Significantly, Walgreens' unique history of non-compliance with the CSA and the DEA's consequent ISO, OTSCs, $80 million settlement, all in the wake of a reporting system required by the 2008 CIA, combine to make this derivative action unique and distinct from other corporate boards. A typical corporate board might plausibly claim ignorance concerning isolated compliance failures. In this case, however, the Walgreens Board was made specifically and uniquely accountable and responsible under the 2008 CIA for monitoring, ensuring, and enforcing the Company's compliance with "all applicable Federal health care program requirements and with Walgreens's own Policies and Procedures," including "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization." Further, although only six of these directors were on the Board at the time the 2008 CIA was executed (Skinner, Wasson, Foote, McNally, Schlichting, and Silva), by the terms of that agreement, all of the directors have received general and specific training regarding the 2008 CIA's requirements and the Company's Compliance Program, as amended by

the 2008 CIA. This would include reviewing the Company's policies regarding "the proper and accurate documentation of medical and prescription records" and "the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization." The directors' conscious decision to ignore these responsibilities, and to instead knowingly cause, and incentivize, Walgreens to undertake violations of the CSA as an intentional business strategy, cannot be regarded as a valid exercise of business judgment.

163. Moreover, this action does not arise from an anomalous incident of misconduct within the Company or from the acts of a rogue employee or division within the Company. Rather, as alleged herein, no fewer than 43 Walgreens pharmacies in Florida purchased in excess of 500,000 dosage units of oxycodone in 2011, despite a national average of approximately 74,000 dosage units and a Florida average of 110,000. Walgreens channeled these Schedule II drugs to the black market as a direct result of the Board's decision to willfully disregard the requirements imposed by applicable law and the 2008 CIA.

**B.    Demand Is Excused Because a Majority of the Current Board Members Are Conflicted by a Substantial Likelihood of Liability Arising from Their Misconduct**

164. Even if knowingly presiding over illegal conduct could somehow fall within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the members of the current Board are not disinterested or independent and cannot, therefore, properly consider any demand.

165. As an initial matter, the Board has also effectively conceded, in the Company's financial filings, that Defendants Wasson, Murphy, and Pessina are not independent directors of the Company. Defendant Wasson's principal occupation is as Walgreens' CEO. According to public filings made with the SEC, since 2008, Defendant Wasson has received in excess of $38.8 million in salary and other compensation from Walgreens. As a result of this lucrative

employment relationship, Defendant Wassan has received and will receive valuable financial benefits from the Company – benefits that would be lost if Wasson's employment relationship were severed. As such, Wasson is incapable of impartially considering a demand to commence this action.[11]

166. Defendant Murphy is not independent because he is a partner of KKR and serves on the Board pursuant to the Company Shareholder Agreement among Walgreens, KKR, and others in connection with Walgreens investment in Alliance Boots, of which Murphy is a director. In addition, in September 2012, KKR co-managing underwriter of $4 billion in debt securities for Walgreens, which the Company has identified as a "Related Transaction." Walgreens does not identify Murphy as an independent director in its proxy filings.

167. Defendant Pessina is not independent because he currently serves as Executive Chairman of Alliance Boots, a 45%-owned subsidiary acquired by Walgreens in 2012. According to Walgreen's latest annual proxy statement, filed November 19, 2012, "it is expected that the Company and Alliance Boots and/or their respective affiliates may from time to time engage in commercial transactions and arrangements in connection with initiatives intended to help realize potential synergies across both companies." Walgreens does not identify Pessina as an independent director in its proxy filings.

168. Further, six of the current members of the Board – Defendants Skinner, Wasson, Foote, McNally, Schlichting, and Silva – face a substantial likelihood of liability because they

---

[11] Defendants Wasson and McNally are also incapable of impartially considering a demand to commence this action because Chief Chudnow specifically alerted Wasson and McNally, in his March 2011 letters, that Walgreens' pharmacies in Oviedo, Florida had "become a bastion of illegal drug sales and drug use," and oxycodone in particular. Despite this knowledge, Wasson and McNally allowed oxycodone sales in Florida to continue climbing over the following months.

each served on the Board since at least January 9, 2008,[12] well before Walgreens entered into the 2008 CIA in September 2008.

169.    As alleged herein, the 2008 CIA required Walgreens to implement written policies and procedures regarding the operation of the Company's compliance program and its compliance with the Federal health care program requirements.

170.    Among other things, these policies and procedures were required to address the proper and accurate documentation of medical and prescription records and the proper and accurate dispensing of prescription drugs, including federal and state law requirements relating to prior authorization.  A Compliance Officer within the Company was designated to develop and implement all of the policies, procedures, and practices designed to ensure compliance with the requirements set forth in the 2008 CIA and with applicable Federal health care programs, including those involving documentation of prescription records and proper and accurate dispensing of prescription drugs.  The Compliance Officer was required to file periodic (at least quarterly) reports regarding Federal health care program compliance matters directly to the Audit Committee.

171.    Similarly, and in connection with the 2008 CIA, Walgreens established a Compliance Committee in order to meet the Company's obligations under the 2008 CIA.  The Compliance Committee was chaired by the Compliance Officer and was required to include members of "upper management."  The Compliance Committee was required to make at least annual reports to the Audit Committee.  It is reasonable to infer that the Company (and the Board) complied with these requirements and received regular updates from the Compliance Officer and/or the Compliance Committee.

---

[12] Defendant Silva, who joined the Board on January 9, 2008, was the Board's newest member when Walgreens entered into the 2008 CIA in September 2008.

172.    Additionally, the 2008 CIA mandated that the Audit Committee would be responsible for review and oversight of matters related to compliance with the requirements of Federal health care programs and the obligations of the CIA, which would include the CIA's obligations regarding compliance with how prescription records are documented and how prescription drugs are properly and accurately dispensed.   At least quarterly, the Audit Committee would meet, review, and oversee Walgreens' Compliance Program, including, but not limited to, the performance of the Compliance Officer and Compliance Committee.   It is reasonable to infer that the Audit Committee (and therefore the rest of the Board) would have complied with these requirements and therefore would have received regular updates of incidents regarding them.

173.    In addition to the compliance reporting required under the 2008 CIA, the Company's Corporate Governance Guidelines and Code of Business Conduct also ensured that the members of the Board were awash in "red flags" that necessarily informed them of the rampant violations taking place within the Company.   Walgreens' Corporate Governance Guidelines required Walgreens' management to provide such information to the Board:

> Information and data that is important to the Board's understanding of the business is distributed in writing to Board members in advance of meetings whenever practicable.   Management will make every attempt to see that this material is provided in a clear and concise form.   Management will provide key information regarding the Company's business and financial results between meetings.

*          *          *

> Board members have complete access to the Company's management and its independent auditors.   The Board encourages management to bring managers who can provide additional insight into the items being discussed into Board meetings.

*          *          *

> Directors are expected to attend the annual meeting of shareholders and all meetings of the Board and the committees of which they are members, unless

prevented by unavoidable circumstances. Each director must review materials submitted to him/her in advance of any such meeting so as to familiarize himself/herself with those matters.

Walgreens' Corporate Governance Guidelines ¶¶ 7, 10, 14.

174. Similarly, Walgreens' Code of Business Conduct describe the Walgreen Compliance Office's "objectives . . . to . . . [p]rovide status reports to the Compliance Committee and the Audit Committee of the Board of Directors"; to "[i]nvestigate compliance issues and questions submitted to the Compliance Office and provide recommendation, answers or solutions"; and to "[l]ead change in the company related to compliance activities."

175. The Board also employs an ongoing Enterprise Risk Management ("ERM") process under the direction of management's Risk Steering Committee. According to Walgreens' filings with the SEC, the Company's ERM approach helps the Board and its committees to receive relevant information about and understand the Company's risk management process, the participants in the process, and key information gathered through the process. The purpose of the ERM process is to identify risks that could affect the Company and the achievement of its strategic objectives, to understand, assess and prioritize those risks, and to facilitate the implementation of risk mitigation strategies and processes across the Company. The key risks identified through this process are reviewed with the full Board. Throughout the year, the Board and its committees also provide oversight and guidance to management regarding the Company's strategy, operating plans and operating performance, and management identifies potential risk management matters for consideration by the Board and/or its committees.

176. Given these duties placed on the directors on the Board, to the extent any of these Individual Defendants did not have actual knowledge of the extensive violations of the 2008 CSA taking place within Walgreens, such lack of knowledge could only be the product of willful blindness that constitutes a bad faith breach of their fiduciary duties.

177.    Defendants also were required to act upon this information to protect the Company from continued legal violations being committed in its name.  Rather than doing so, these Defendants, in violation of their fiduciary obligations, consciously ignored the information presented to them and about which they were otherwise made aware concerning the Company's extensive violations of the CSA.  As a result, Defendants Skinner, Wasson, Foote, McNally, Schlichting, and Silva face a substantial likelihood of liability for their conduct.

178.    Defendants Babiak, Brailer, Schlichting, Silva, and Skinner also are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Audit Committee.  The Audit Committee's charter imposes specific duties on members of this committee to "[p]eriodically review and discuss the overall adequacy and effectiveness of the Company's legal, regulatory and compliance programs" and to "meet periodically with the Company's Chief Compliance Officer."  The Audit Committee "has the authority to investigate any activity of the Company in order to adequately discharge its responsibility . . . ."  Moreover, the Audit Committee was required by its Charter to report its findings to the Board as a whole:

> Committee Reports to the Board.  The Chair of the Committee shall report to the Board regarding the activities of the Committee at appropriate times and as otherwise requested by the Chairman of the Board. ***The Committee shall review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements***, the performance and independence of the Company's independent auditor, or the performance of the internal audit function.

(Emphasis added.)

179.    In accordance with its charter, the Audit Committee also reviews the Company's policies and processes with respect to risk assessment.  On a quarterly basis, the Audit Committee reviews and discusses the key risks identified in the ERM process with management, their potential impact on our Company and risk mitigation strategies.

180.    As members of the Audit Committee, Defendants Babiak, Brailer, Schlichting, Silva, and Skinner violated their fiduciary duties to act in good faith to address the pervasive legal violations discussed herein.   Accordingly, Defendants Babiak, Schlichting, Silva, and Skinner face a substantial likelihood of liability and cannot appropriately consider a demand, and therefore demand is excused with respect to these Defendants.

181.    Further, Defendants Davis, Foote, Frissora, McNally, and Silva are conflicted from considering a demand because they each face a substantial likelihood of liability as a result of their conduct on the Nominating and Corporate Governance Committee.   Pursuant to the Corporate Governance Committee's charter, the members of the Corporate Governance Committee are specifically charged with "establishing the corporate governance principals of the Company," including overseeing the "evaluation . . . of the effectiveness of the Board and its committees and management."   In addition, the members of the Nominating and Corporate Governance Committee are required to "review the Company's Code of Business Conduct and recommend any changes to the Board."   The Nominating and Corporate Governance Committee is also required, at each regular meeting, to oversee management of risks relating to its areas of responsibility, including risks incident to the Company's governance structures.   Defendants Davis, Foote, Frissora, McNally, and Silva breached their fiduciary duties of loyalty and good faith by acquiescing, permitting, and/or failing to detect and prevent a Company-wide scheme that flouted applicable law.

182.    The rampant Company-wide conduct described herein, which included violations of the CSA, placed profits ahead of patients and ultimately resulting in a record $80 million settlement and substantial damage to Walgreens' reputation.   The misconduct described herein was so pervasive that it cannot be explained away as an isolated occurrence.   In light of the

number of violations, their severity, and their persistence despite the Board-level reporting system established by the 2008 CIA and the repeated admonitions of federal and state law enforcement, the facts compel the conclusion that the Individual Defendants knew of this malfeasance but did nothing to prevent it.

## COUNT I - BREACH OF FIDUCIARY DUTY

### (Against the Individual Defendants)

183. Plaintiff realleges and incorporates paragraphs 1 through 182 as set forth above as if fully set forth herein.

184. Each of the Individual Defendants owed the Company and its shareholders the highest duties of loyalty, good faith, honesty, and care in conducting their affairs and the business of the Company.

185. Under the current circumstances, the Individual Defendants also had a duty to:

      a.      act in the interests of the Company and all of its equity owners; and

      b.      act in accordance with the fundamental duties of loyalty, care and good faith.

186. In causing or allowing the Company to fail to maintain adequate controls in the Company's core operations, the Individual Defendants have breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

187. Each of the Individual Defendants had actual or constructive knowledge that they caused the Company to engage in improper practices. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

188. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Walgreens has sustained significant damages.

189.     Accordingly, Plaintiff, as a shareholder of the Company, seeks monetary damages, injunctive remedies, and other forms of equitable relief on Walgreens' behalf.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including preliminary and permanent injunctive relief, in its favor and in favor of the Company, as appropriate, against all of the Individual Defendants as follows:

a.     Authorizing the maintenance of this action as a derivative action, with Plaintiff as derivative plaintiff;

b.     Declaring that the Individual Defendants have violated their fiduciary duties to the Company;

c.     Awarding compensatory damages against Defendants individually and severally in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

d.     Awarding Plaintiff the costs and disbursements of this action, including reasonable allowances for Plaintiff's attorneys' and experts' fees and expenses; and

e.     Granting such other or further relief as may be just and proper under the circumstances.

Dated:  August 13, 2013

Respectfully submitted,

                                         /s/ Carol V. Gilden
Gregg S. Levin                           Carol V. Gilden
Lance V. Oliver                          COHEN MILSTEIN SELLERS & TOLL, PLLC
William S. Norton                        190 South LaSalle Street
Christopher F. Moriarty                  Suite 1705
MOTLEY RICE LLC                          Chicago, Illinois 60603
28 Bridgeside Boulevard                  Telephone:  312.357.0370
Mt. Pleasant, South Carolina 29464       Facsimile:  312.357.0369
Telephone:  843.216.9000                 cgilden@cohenmilstein.com
Facsimile:  843.216.9000                 ARDC No:  6185530

*Counsel for Plaintiff*                  *Local Counsel for Plaintiff*

## VERIFICATION

| | |
|---|---|
| STATE OF FLORIDA | ) |
| | ) ss. : |
| COUNTY OF MIAMI-DADE | ) |

I, Dan Givens, verify and declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am the Administrator of Miami Firefighters' Relief and Pension Fund ("Miami Firefighters"). I have the authority to make material decisions for Miami Firefighters, including the authority to make the decision to initiate this litigation.

2.     I have reviewed the allegations in the foregoing Verified Derivative Complaint (the "Complaint") prepared on behalf of Miami Firefighters by Motley Rice LLC. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As for the allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I authorize the filing of the Complaint.

3.     Miami Firefighters currently holds 17,425 shares of Walgreen Co. ("Walgreens" or the "Company") common stock, and has been a continuous holder of Walgreen stock since at least April 30, 2005.

4.     Miami Firefighters is ready, willing, and able to fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of the Company.

Dated: August 13, 2013

Dan Givens
Administrator